# BOARD OF COUNTY COMMISSIONERS, WABAUNSEE COUNTY, KANSAS
## v. UMBEHR

No. 94–1654.  Argued November 28, 1995—Decided June 28, 1996

O'CONNOR, J., delivered the opinion of the Court with respect to Parts I, II–A, II–B–2, and III, in which REHNQUIST, C. J., and STEVENS, KENNEDY, SOUTER, GINSBURG, and BREYER, JJ., joined, and the opinion of the Court with respect to Part II–B–1, in which STEVENS, KENNEDY, SOUTER, GINSBURG, and BREYER, JJ., joined. SCALIA, J., filed a dissenting opinion, in which THOMAS, J., joined, *post*, p. 686.

*Donald Patterson* argued the cause for petitioner. With him on the briefs was *Steve R. Fabert.*

*Robert A. Van Kirk* argued the cause for respondent. With him on the brief was *Richard H. Seaton.*

*Beth S. Brinkmann* argued the cause for the United States as *amicus curiae* urging affirmance. On the brief were *Solicitor General Days, Assistant Attorney General Hunger, Deputy Solicitor General Bender, Cornelia T. L. Pillard, William Kanter,* and *Robert D. Kamenshine.**

JUSTICE O'CONNOR delivered the opinion of the Court.†

This case requires us to decide whether, and to what extent, the First Amendment protects independent contractors from the termination of at-will government contracts in retaliation for their exercise of the freedom of speech.

I

Under state law, Wabaunsee County, Kansas (County), is obliged to provide for the disposal of solid waste generated

---

*Briefs of *amici curiae* urging affirmance were filed for the American Civil Liberties Union et al. by *Robin L. Dahlbert, Marjorie Heins,* and *Steven R. Shapiro;* and for the Planned Parenthood Federation of America, Inc., by *Bruce J. Ennis, Jr., Anthony C. Epstein, Julie M. Carpenter, Nory Miller, Roger K. Evans, Dara Klassel,* and *Eve W. Paul.*

†THE CHIEF JUSTICE joins all but Part II–B–1 of this opinion.

within its borders. In 1981, and, after renegotiation, in 1985, the County contracted with respondent Umbehr for him to be the exclusive hauler of trash for cities in the County at a rate specified in the contract. Each city was free to reject or, on 90 days' notice, to opt out of, the contract. By its terms, the contract between Umbehr and the County was automatically renewed annually unless either party terminated it by giving notice at least 60 days before the end of the year or a renegotiation was instituted on 90 days' notice. Pursuant to the contract, Umbehr hauled trash for six of the County's seven cities from 1985 to 1991 on an exclusive and uninterrupted basis.

During the term of his contract, Umbehr was an outspoken critic of petitioner, the Board of County Commissioners of Wabaunsee County (Board), the three-member governing body of the County. Umbehr spoke at the Board's meetings, and wrote critical letters and editorials in local newspapers regarding the County's landfill user rates, the cost of obtaining official documents from the County, alleged violations by the Board of the Kansas Open Meetings Act, the County's alleged mismanagement of taxpayers' money, and other topics. His allegations of violation of the Kansas Open Meetings Act were vindicated in a consent decree signed by the Board's members. Umbehr also ran unsuccessfully for election to the Board.

The Board's members allegedly took Umbehr's criticism badly, threatening the official county newspaper with censorship for publishing his writings. In 1990, they voted, 2 to 1, to terminate (or prevent the automatic renewal of) Umbehr's contract with the County. That attempt at termination failed because of a technical defect, but in 1991, the Board succeeded in terminating Umbehr's contract, again by a 2 to 1 vote. Umbehr subsequently negotiated new contracts with five of the six cities that he had previously served.

In 1992, Umbehr brought this suit against the two majority Board members in their individual and official capacities

under Rev. Stat. § 1979, as amended, 42 U. S. C. § 1983, alleging that they had terminated his government contract in retaliation for his criticism of the County and the Board. The Board members moved for summary judgment. The District Court assumed that Umbehr's contract was terminated in retaliation for his speech, and that he suffered consequential damages. But it held that "the First Amendment does not prohibit [the Board] from considering [Umbehr's] expression as a factor in deciding not to continue with the trash hauling contract at the end of the contract's annual term," because, as an independent contractor, Umbehr was not entitled to the First Amendment protection afforded to public employees. *Umbehr* v. *McClure*, 840 F. Supp. 837, 839 (Kan. 1993). It also held that the claims against the Board members in their *individual* capacities would be barred by qualified immunity, *id.*, at 841, a ruling which was affirmed on appeal and which is not at issue here.

The United States Court of Appeals for the Tenth Circuit reversed (except as to qualified immunity), holding that "an independent contractor is protected under the First Amendment from retaliatory governmental action, just as an employee would be," and that the extent of protection is to be determined by weighing the government's interests as contractor against the free speech interests at stake in accordance with the balancing test that we used to determine government employees' First Amendment rights in *Pickering* v. *Board of Ed. of Township High School Dist. 205, Will Cty.*, 391 U. S. 563, 568 (1968). 44 F. 3d 876, 883 (CA10 1995). It therefore remanded the official capacity claims to the District Court for further proceedings, including consideration of whether the termination was in fact retaliatory. The Board members who were the original defendants in this suit subsequently resigned their positions on the Board, so in this Court, the Board was substituted for them as petitioner. See this Court's Rule 35.3.

We granted certiorari to resolve a conflict between the Courts of Appeals regarding whether, and to what extent, independent contractors are protected by the First Amendment. The Fifth and Eighth Circuits agree with the Tenth Circuit. See *Blackburn* v. *Marshall,* 42 F. 3d 925, 931–935 (CA5 1995); *Copsey* v. *Swearingen,* 36 F. 3d 1336, 1344 (CA5 1994); *North Mississippi Communications, Inc.* v. *Jones,* 792 F. 2d 1330 (CA5 1986); *Smith* v. *Cleburne County Hospital,* 870 F. 2d 1375, 1381 (CA8), cert. denied, 493 U. S. 847 (1989); but see *Sweeney* v. *Bond,* 669 F. 2d 542 (CA8), cert. denied, 459 U. S. 878 (1982). See also *Abercrombie* v. *Catoosa,* 896 F. 2d 1228, 1233 (CA10 1990) (allowing an independent contractor to sue for termination based on his speech and political activities). The Third and Seventh Circuits have, however, held that an independent contractor who does not have a property interest in his contract with the government has no right not to have that contract terminated in retaliation for his exercise of First Amendment freedoms of political affiliation and participation. See *Horn* v. *Kean,* 796 F. 2d 668 (CA3 1986) (en banc); *O'Hare Truck Service, Inc.* v. *Northlake,* 47 F. 3d 883 (CA7 1995), reversed, *post,* p. 712; *Downtown Auto Parks, Inc.* v. *Milwaukee,* 938 F. 2d 705 (CA7), cert. denied, 502 U. S. 1005 (1991); *Triad Assocs., Inc.* v. *Chicago Housing Authority,* 892 F. 2d 583 (CA7 1989), cert. denied, 498 U. S. 845 (1990).

We agree with the Tenth Circuit that independent contractors are protected, and that the *Pickering* balancing test, adjusted to weigh the government's interests as contractor rather than as employer, determines the extent of their protection. We therefore affirm.

## II

### A

This Court has not previously considered whether, and to what extent, the First Amendment restricts the freedom of

federal, state, or local governments to terminate their relationships with independent contractors because of the contractors' speech. We have, however, considered the same issue in the context of government *employees'* rights on several occasions. The similarities between government employees and government contractors with respect to this issue are obvious. The government needs to be free to terminate both employees and contractors for poor performance, to improve the efficiency, efficacy, and responsiveness of service to the public, and to prevent the appearance of corruption. And, absent contractual, statutory, or constitutional restriction, the government is entitled to terminate them for no reason at all. But either type of relationship provides a valuable financial benefit, the threat of the loss of which in retaliation for speech may chill speech on matters of public concern by those who, because of their dealings with the government, "are often in the best position to know what ails the agencies for which they work," *Waters* v. *Churchill*, 511 U. S. 661, 674 (1994) (plurality opinion). Because of these similarities, we turn initially to our government employment precedents for guidance.

Those precedents have long since rejected Justice Holmes' famous dictum, that a policeman "may have a constitutional right to talk politics, but he has no constitutional right to be a policeman," *McAuliffe* v. *Mayor of New Bedford*, 155 Mass. 216, 220, 29 N. E. 517 (1892). Recognizing that "constitutional violations may arise from the deterrent, or 'chilling,' effect of governmental [efforts] that fall short of a direct prohibition against the exercise of First Amendment rights," *Laird* v. *Tatum*, 408 U. S. 1, 11 (1972), our modern "unconstitutional conditions" doctrine holds that the government "may not deny a benefit to a person on a basis that infringes his constitutionally protected . . . freedom of speech" even if he has no entitlement to that benefit, *Perry* v. *Sindermann*, 408 U. S. 593, 597 (1972). We have held that government workers are constitutionally protected from dismissal for re-

fusing to take an oath regarding their political affiliation, see, *e. g., Wieman* v. *Updegraff,* 344 U. S. 183 (1952); *Keyishian* v. *Board of Regents of Univ. of State of N. Y.,* 385 U. S. 589 (1967), for publicly or privately criticizing their employer's policies, see *Perry, supra; Mt. Healthy City Bd. of Ed.* v. *Doyle,* 429 U. S. 274 (1977); *Givhan* v. *Western Line Consol. School Dist.,* 439 U. S. 410 (1979), for expressing hostility to prominent political figures, see *Rankin* v. *McPherson,* 483 U. S. 378 (1987), or, except where political affiliation may reasonably be considered an appropriate job qualification, for supporting or affiliating with a particular political party, see, *e. g., Branti* v. *Finkel,* 445 U. S. 507 (1980). See also *United States* v. *Treasury Employees,* 513 U. S. 454 (1995) (Government employees are protected from undue burdens on their expressive activities created by a prohibition against accepting honoraria); *Abood* v. *Detroit Bd. of Ed.,* 431 U. S. 209, 234 (1977) (government employment cannot be conditioned on making or not making financial contributions to particular political causes).

While protecting First Amendment freedoms, we have, however, acknowledged that the First Amendment does not create property or tenure rights, and does not guarantee absolute freedom of speech. The First Amendment's guarantee of freedom of speech protects government employees from termination *because of* their speech on matters of public concern. See *Connick* v. *Myers,* 461 U. S. 138, 146 (1983) (speech on merely private employment matters is unprotected). To prevail, an employee must prove that the conduct at issue was constitutionally protected, and that it was a substantial or motivating factor in the termination. If the employee discharges that burden, the government can escape liability by showing that it would have taken the same action even in the absence of the protected conduct. See *Mt. Healthy, supra,* at 287. And even termination because of protected speech may be justified when legitimate countervailing government interests are sufficiently strong.

Government employees' First Amendment rights depend on the "balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering*, 391 U. S., at 568. In striking that balance, we have concluded that "[t]he government's interest in achieving its goals as effectively and efficiently as possible is elevated from a relatively subordinate interest when it acts as sovereign to a significant one when it acts as employer." *Waters*, 511 U. S., at 675 (plurality opinion). We have, therefore, "consistently given greater deference to government predictions of harm used to justify restriction of employee speech than to predictions of harm used to justify restrictions on the speech of the public at large." *Id.*, at 673; accord, *Treasury Employees*, *supra*, at 475.

The parties each invite us to differentiate between independent contractors and employees. The Board urges us not to "extend" the First Amendment rights of government employees to contractors. Umbehr, joined by the Solicitor General as *amicus curiae*, contends that, on proof of viewpoint-based retaliation for contractors' political speech, the government should be required to justify its actions as narrowly tailored to serve a compelling state interest.

Both parties observe that independent contractors in general, and Umbehr in particular, work at a greater remove from government officials than do most government employees. In the Board's view, the key feature of an independent contractor's contract is that it does not give the government the right to supervise and control the details of how work is done. The Board argues that the lack of day-to-day control accentuates the government's need to have the work done by someone it trusts, cf. *Branti*, *supra*, at 518 (certain positions in government employment implicate such a need for trust that their award on the basis of party political affiliation is

justified), and to resort to the sanction of termination for unsatisfactory performance.*   Umbehr, on the other hand, argues that the government interests in maintaining harmonious working environments and relationships recognized in our government employee cases are attenuated where the contractor does not work at the government's workplace and does not interact daily with government officers and employees.   He also points out that to the extent that he is publicly perceived as an *independent* contractor, any government concern that his political statements will be confused with the government's political positions is mitigated.   The Board and the dissent, *post*, at 697–699, retort that the cost of fending off litigation, and the potential for government contracting practices to ossify into prophylactic rules to avoid potential litigation and liability, outweigh the interests of independent contractors, who are typically less financially dependent on their government contracts than are government employees.

Each of these arguments for and against the imposition of liability has some force.   But all of them can be accommodated by applying our existing framework for government employee cases to independent contractors.   *Mt. Healthy* assures the government's ability to terminate contracts so long as it does not do so in retaliation for protected First Amendment activity.   *Pickering* requires a fact-sensitive and deferential weighing of the government's legitimate interests.

---

*The Board also asserts that state and local government decisions on individual contracts are insulated by the Tenth Amendment or legislative immunity from constitutional scrutiny and liability.   See Brief for Petitioner 23–26, 37.   The Tenth Amendment claim was not raised in its petition, so we do not address it.   See this Court's Rule 14.1(a).   Because only claims against the Board members in their *official* capacities are before us, and because immunity from suit under § 1983 extends to public servants only in their *individual* capacities, see, *e. g., Leatherman* v. *Tarrant County Narcotics Intelligence and Coordination Unit,* 507 U. S. 163, 166 (1993), the legislative immunity claim is moot.

The dangers of burdensome litigation and the *de facto* imposition of rigid contracting rules necessitate attentive application of the *Mt. Healthy* requirement of proof of causation and substantial deference, as mandated by *Pickering, Connick,* and *Waters,* to the government's reasonable view of its legitimate interests, but not a *per se* denial of liability. Nor can the Board's and the dissent's generalization that independent contractors may be less dependent on the government than government employees, see *post,* at 696, justify denial of all First Amendment protection to contractors. The tests that we have established in our government employment cases must be judicially administered with sensitivity to governmental needs, but First Amendment rights must not be neglected.

Umbehr's claim that speech threatens the government's interests as contractor less than its interests as employer will also inform the application of the *Pickering* test. Umbehr is correct that if the Board had exercised sovereign power against him as a citizen in response to his political speech, it would be required to demonstrate that its action was narrowly tailored to serve a compelling governmental interest. But in this case, as in government employment cases, the Board exercised contractual power, and its interests as a public service provider, including its interest in being free from intensive judicial supervision of its daily management functions, are potentially implicated. Deference is therefore due to the government's reasonable assessments of its interests *as contractor.*

We therefore see no reason to believe that proper application of the *Pickering* balancing test cannot accommodate the differences between employees and independent contractors. There is ample reason to believe that such a nuanced approach, which recognizes the variety of interests that may arise in independent contractor cases, is superior to a bright-line rule distinguishing independent contractors from employees. The bright-line rule proposed by the Board and

the dissent would give the government *carte blanche* to terminate independent contractors for exercising First Amendment rights. And that bright-line rule would leave First Amendment rights unduly dependent on whether state law labels a government service provider's contract as a contract of employment or a contract for services, a distinction which is at best a very poor proxy for the interests at stake. See Comment, Political Patronage in Public Contracting, 51 U. Chi. L. Rev. 518, 520 (1984) ("[N]o legally relevant distinction exists between employees and contractors in terms either of the government's interest in using patronage or of the employee or contractor's interest in free speech"); cf. *Perry*, 408 U. S., at 597 (the prohibition of unconstitutional conditions on speech applies "regardless of the public employee's contractual or other claim to a job"). Determining constitutional claims on the basis of such formal distinctions, which can be manipulated largely at the will of the government agencies concerned, see *Logue* v. *United States*, 412 U. S. 521, 532 (1973) (noting that independent contractors are often employed to perform "tasks that would . . . otherwise be performed by salaried Government employees"), is an enterprise that we have consistently eschewed. See, *e. g.*, *Lefkowitz* v. *Turley*, 414 U. S. 70, 83 (1973) (in the context of the privilege against self-incrimination, "[w]e fail to see a difference of constitutional magnitude between the threat of job loss to an employee of the State, and a threat of loss of contracts to a contractor"); cf. *Colorado Republican Federal Campaign Comm.* v. *Federal Election Comm'n, ante*, at 622 (opinion of BREYER, J.) ("[T]he government 'cannot foreclose the exercise of [First Amendment] rights by mere labels'") (quoting *NAACP* v. *Button*, 371 U. S. 415, 429 (1963)); *Escobedo* v. *Illinois*, 378 U. S. 478, 486 (1964) (declining to "exalt form over substance" in determining the temporal scope of Sixth Amendment protections); *Crowell* v. *Benson*, 285 U. S. 22, 53 (1932) ("[R]egard must be had, . . . in . . . cases where constitutional limits are invoked, not to mere matters of form

but to the substance of what is required"); *Chicago, B. & Q. R. Co.* v. *Chicago*, 166 U. S. 226, 235 (1897) ("In determining what is due process of law regard must be had to substance, not to form"); *Browning-Ferris Industries of Vt., Inc.* v. *Kelco Disposal, Inc.*, 492 U. S. 257, 299 (1989) (O'CONNOR, J., concurring in part and dissenting in part) ("[T]he applicability of a provision of the Constitution has never depended on the vagaries of state or federal law").

Furthermore, the arguments made by both parties demonstrate that it is far from clear, as a general matter, whether the balance of interests at stake is more favorable to the government in independent contractor cases than in employee cases. Our unconstitutional conditions precedents span a spectrum from government employees, whose close relationship with the government requires a balancing of important free speech and government interests, to claimants for tax exemptions, *Speiser* v. *Randall*, 357 U. S. 513 (1958), users of public facilities, *e. g.*, *Lamb's Chapel* v. *Center Moriches Union Free School Dist.*, 508 U. S. 384, 390–394 (1993); *Healy* v. *James*, 408 U. S. 169 (1972), and recipients of small government subsidies, *e. g.*, *FCC* v. *League of Women Voters of Cal.*, 468 U. S. 364 (1984), who are much less dependent on the government but more like ordinary citizens whose viewpoints on matters of public concern the government has no legitimate interest in repressing. The First Amendment permits neither the firing of janitors nor the discriminatory pricing of state lottery tickets based on the government's disagreement with certain political expression. Independent contractors appear to us to lie somewhere between the case of government employees, who have the closest relationship with the government, and our other unconstitutional conditions precedents, which involve persons with less close relationships with the government. The Board's and the dissent's assertion, *post*, at 687, 696–697, that the decision below represents an unwarranted "extension" of

special protections afforded to government employees is, therefore, not persuasive.

## B

### 1

The dissent's fears of excessive litigation, see *post*, at 697–699, cannot justify a special exception to our unconstitutional conditions precedent to deprive independent government contractors of protection. Nor can its assertion that the allocation of government contracts on the basis of political bias is a "long and unbroken tradition of our people." *Post*, at 688. We do not believe that tradition legitimizes patronage contracting, regardless of whether one approaches the role of tradition in First Amendment adjudication from the perspective of Part I of the *Rutan* dissent, see *post*, at 687 (quoting *Rutan* v. *Republican Party of Ill.*, 497 U. S. 62, 95 (1990) (SCALIA, J., dissenting)) (a practice that " 'bears the endorsement of a long tradition of *open, widespread, and unchallenged* use that dates back to the beginning of the Republic' " is presumed constitutional) (emphasis added), or from that of Justice Holmes, compare *post*, at 690 (quoting Holmes' discussion of traditional usage of legal terminology in a tax case) with *Abrams* v. *United States*, 250 U. S. 616, 630 (1919) (Holmes, J., dissenting) (rejecting both the self-interested "logi[c]" and the long history of the suppression of free speech, including the Sedition Act of 1798 and "the common law as to seditious libel," in favor of the true "theory of our Constitution," which values free speech as essential to, not subject to the vicissitudes of, our political system).

The examples to which the dissent cites, *post*, at 688–690, are not, in our view, " 'the stuff out of which the Court's principles are to be formed,' " *post*, at 687 (quoting *Rutan*, *supra*, at 96 (SCALIA, J., dissenting)). Consider, for example, the practice of "courtroom patronage," whereby "[e]lected judges, who owe their nomination and election to the party, give the organization lucrative refereeships, trusteeships,

and receiverships which often yield legal fees unjustified by the work required," M. Tolchin & S. Tolchin, To The Victor: Political Patronage from the Clubhouse to the White House 15 (1971); see also Wolfinger, Why Political Machines Have Not Withered Away and Other Revisionist Thoughts, 34 J. Politics 365, 367, 371 (1972) (similar), or the award of "gift[s]" to political supporters under the guise of research grants, Tolchin, *supra*, at 61, or the allocation of contracts based on "contributions resulting from the compound of bribery and extortion" and "kickbacks," A. Heard, The Costs of Democracy 143, 144 (1960), or the practice of " 'beer politics,' " whereby "wholesale liquor licenses issued by the state were traded for campaign contributions," *id.*, at 144, or the extortion of political support and "campaign contributions" on pain of being branded a "Communist," R. Caro, The Power Broker: Robert Moses and the Fall of New York 726 (1975), or the "favorable consideration in the courts or by public agencies" expected in one city by the clients of " 'political' attorneys with part-time public jobs," Wolfinger, *supra*, at 389, or the question reportedly asked by a party official of a businessman who was reluctant to contribute to a mayoralty campaign, " 'Look, you [expletive deleted], do you want a snow-removal contract or don't you?,' " *id.*, at 368. These examples, cited by the dissent, many of which involve patronage in employment and appointments rather than in contracting, cf. Comment, Political Patronage, at 518, n. 4 ("[P]atronage systems have traditionally centered around the distribution of government *jobs*" (emphasis added)), may suggest that abuses of power in the name of patronage are not "highly unusual," *post*, at 710. It may also be the case that the victims whose speech is chilled and whose contributions are extracted by such government action are often " 'honorable and prudent businessmen.' " *Post*, at 689 (quoting Heard, *supra*, at 145). But the dissent's examples do not establish an "open and unchallenged" tradition of allocating government contracts on the basis of political bias—much

less on the basis of disapproval of political speech. The dissent's own sources note that the patronage practices that they report were denied and disavowed by their alleged practitioners, see Wolfinger, *supra,* at 367, n. 2, 372–373, n. 11, that they were most significant in secret and specialized contexts such as defense contracting that "operat[e] in an atmosphere uninhibited by the usual challenges of representative government," Tolchin, *supra,* at 233, and that in many cases they were illegal, see Heard, *supra,* at 143–144, n. 4. We of course agree with the dissent that mere "obnoxious[ness]," *post,* at 690, and criminality do not make a practice unconstitutional. Nor, however, do the dissent's examples of covert, widely condemned, and sometimes illegal government action legitimize the government discrimination based on the viewpoint of one's speech or one's political affiliations that is involved here.

2

The dissent's own description of the "lowest-responsible-bidder" and other, similar requirements covering a wide range of government contracts that the Federal Government, all 50 States, and many local government authorities, have voluntarily adopted, see *post,* at 690–695, at least suggests that government contracting norms incompatible with political bias have proliferated without unduly burdening the government. In fact, lowest- and lowest-responsible-bidder requirements have a long history, as a survey of 19th century state constitutions and federal territorial legislation reveals. See, *e. g.,* Ala. Const., Art. IV, § 30 (1875), in 1 Federal and State Constitutions 161 (F. Thorpe ed. 1909); Civil Government in Alaska Act, Tit. I, § 2 (1900), in *id.,* at 243; Ark. Const., Art. XIX, §§ 15, 16 (1874), in *id.,* at 366; Colo. Const., Art. V, § 29 (1876), in *id.,* at 485; Del. Const., Art. XV, § 8 (1897), in *id.,* at 631; Permanent Government for District of Columbia Act, § 5 (1878), in *id.,* at 645–646; Ill. Const., Art. III, § 39 (1848), in 2 *id.,* at 991; Ill. Const., Art. IV, § 25 (1870), in *id.,* at 1022; Kan. Const., Art. XVI, § 2 (1858), in *id.,* at

1236; Ky. Const., § 247 (1890), in 3 *id.*, at 1353; La. Const., Art. 42 (1879), in *id.*, at 1447–1478; La. Const., Art. 44 (1898), in *id.*, at 1529; Mich. Const., Art. IV, § 22 (1850), in 4 *id.*, at 1948–1949; Miss. Const., Art. 4, § 107 (1890), in *id.*, at 2102; Mont. Const., Art. V, § 30 (1889), in *id.*, at 2308; Neb. Const., Art. II, § 23 (1866–1867), in *id.*, at 2353; Ohio Const., Art. XV, § 2 (1851), in 5 *id.*, at 2932; Pa. Const., Art. III, § 12 (1873), in *id.*, at 3127; Tex. Const., Art. XVI, § 21 (1876), in 6 *id.*, at 3658–3659; W. Va. Const., Art. VI, § 34 (1872), in 7 *id.*, at 4044; Wis. Const., Art. IV, § 25 (1848), in *id.*, at 4083; Wyo. Const., Art. III, § 31 (1889), in *id.*, at 4124; see also Ky. Const., § 164 (1890), in 3 *id.*, at 1341 ("highest and best bidder" rule for municipal and local franchise awards); Miss. Const., Art. I, § 5 (1817, 1832), in 4 *id.*, at 2033, 2049 ("[N]o person shall be molested for his opinions on any subject whatsoever, nor suffer any civil or political incapacity, or acquire any civil or political advantage, in consequence of such opinions, except in cases provided for in this constitution"). We are aware of no evidence of excessive or abusive litigation under such provisions. And, unlike the dissent, *post*, at 699–700, we do not believe that a deferentially administered requirement that the government not unreasonably terminate its commercial relationships on the basis of speech or political affiliation poses a greater threat to legitimate government interests than the complex and detailed array of modern statutory and regulatory government contracting rules.

In sum, neither the Board nor Umbehr have persuaded us that there is a "difference of constitutional magnitude," *Lefkowitz*, 414 U. S., at 83, between independent contractors and employees in this context. Independent government contractors are similar in most relevant respects to government employees, although both the speaker's and the government's interests are typically—though not always—somewhat less strong in the independent contractor case.

We therefore conclude that the same form of balancing analysis should apply to each.

## III

Because the courts below assumed that Umbehr's termination (or nonrenewal) was in retaliation for his protected speech activities, and because they did not pass on the balance between the government's interests and the free speech interests at stake, our conclusion that independent contractors do enjoy some First Amendment protection requires that we affirm the Tenth Circuit's decision to remand the case. To prevail, Umbehr must show that the termination of his contract was motivated by his speech on a matter of public concern, an initial showing that requires him to prove more than the mere fact that he criticized the Board members before they terminated him. If he can make that showing, the Board will have a valid defense if it can show, by a preponderance of the evidence, that, in light of their knowledge, perceptions, and policies at the time of the termination, the Board members would have terminated the contract regardless of his speech. See *Mt. Healthy City Bd. of Ed.* v. *Doyle*, 429 U. S. 274 (1977). The Board will also prevail if it can persuade the District Court that the County's legitimate interests as contractor, deferentially viewed, outweigh the free speech interests at stake. And, if Umbehr prevails, evidence that the Board members discovered facts after termination that would have led to a later termination anyway, and evidence of mitigation of his loss by means of his subsequent contracts with the cities, would be relevant in assessing what remedy is appropriate.

Finally, we emphasize the limited nature of our decision today. Because Umbehr's suit concerns the termination of a pre-existing commercial relationship with the government, we need not address the possibility of suits by bidders or applicants for new government contracts who cannot rely on such a relationship.

Subject to these limitations and caveats, however, we recognize the right of independent government contractors not to be terminated for exercising their First Amendment rights. The judgment of the Court of Appeals is, therefore, affirmed, and the case is remanded for proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE SCALIA, with whom JUSTICE THOMAS joins, dissenting.*

Taken together, today's decisions in *Board of Comm'rs, Wabaunsee Cty.* v. *Umbehr, ante,* p. 668, and *O'Hare Truck Service, Inc.* v. *City of Northlake, post,* p. 712, demonstrate why this Court's Constitution-making process can be called "reasoned adjudication" only in the most formalistic sense.

I

Six years ago, by the barest of margins, the Court expanded *Elrod* v. *Burns,* 427 U. S. 347 (1976), and *Branti* v. *Finkel,* 445 U. S. 507 (1980), which had held that public employees cannot constitutionally be fired on the basis of their political affiliation, to establish the new rule that *applicants* for public employment cannot constitutionally be *rejected* on the basis of their political affiliation. *Rutan* v. *Republican Party of Ill.,* 497 U. S. 62 (1990). The four dissenters argued that "the desirability of patronage is a policy question to be decided by the people's representatives" and "a political question if there ever was one." *Id.,* at 104, 114 (SCALIA, J., dissenting). They were "convinced" that *Elrod* and *Branti* had been "wrongly decided," 497 U. S., at 114; indeed, that those cases were "not only wrong, not only recent, not only contradicted by a long prior tradition, but also . . . unworkable in practice" and therefore "should be overruled," *id.,*

---

*[This opinion applies also to No. 95–191, *O'Hare Truck Service, Inc.* v. *City of Northlake, post,* p. 712.]

at 110–111. At the very least, the dissenters maintained, *Elrod* and *Branti* "should not be extended beyond their facts." 497 U. S., at 114.

Today, with the addition to the Court of another Justice who believes that we have no basis for proscribing as unconstitutional practices that do not violate any explicit text of the Constitution and that have been regarded as constitutional ever since the framing, see, *e. g., Bennis* v. *Michigan,* 516 U. S. 442, 454–455 (1996) (THOMAS, J., concurring), one would think it inconceivable that *Elrod* and *Branti* would be extended *far* beyond *Rutan* to the massive field of all government contracting. Yet amazingly, that is what the Court does in these two opinions—and by lopsided votes, at that. It is profoundly disturbing that the varying political practices across this vast country, from coast to coast, can be transformed overnight by an institution whose conviction of what the Constitution means is so fickle.

The basic reason for my dissent today is the same as one of the reasons I gave (this one not joined by JUSTICE O'CONNOR) in *Rutan:*

> "[W]hen a practice not expressly prohibited by the text of the Bill of Rights bears the endorsement of a long tradition of open, widespread, and unchallenged use that dates back to the beginning of the Republic, we have no proper basis for striking it down. Such a venerable and accepted tradition is not to be laid on the examining table and scrutinized for its conformity to some abstract principle of First Amendment adjudication devised by this Court. To the contrary, such traditions are themselves the stuff out of which the Court's principles are to be formed. They are, in these uncertain areas, the very points of reference by which the legitimacy or illegitimacy of *other* practices is to be figured out. When it appears that the latest 'rule,' or 'three-part test,' or 'balancing test' devised by the Court has placed us on a collision course with such a landmark practice, it is the

former that must be recalculated by us, and not the lat-
ter that must be abandoned by our citizens. I know of
no other way to formulate a constitutional jurisprudence
that reflects, as it should, the principles adhered to, over
time, by the American people, rather than those favored
by the personal (and necessarily shifting) philosophical
dispositions of a majority of this Court." 497 U. S., at
95–96 (dissenting opinion) (footnote omitted).

There can be no dispute that, like rewarding one's allies,
the correlative act of refusing to reward one's opponents—
and at bottom *both* of today's cases involve exactly that—is
an American political tradition as old as the Republic. This
is true not only with regard to employment matters, as Jus-
tice Powell discussed in his dissenting opinions in *Elrod,
supra,* at 377–379, and *Branti, supra,* at 522, n. 1, but also in
the area of government contracts, see, *e. g.,* M. Tolchin &
S. Tolchin, To the Victor: Political Patronage from the Club-
house to the White House 14–15, 61, 233–241, 273–277 (1971);
A. Heard, The Costs of Democracy 143–145 (1960); R. Caro,
The Power Broker: Robert Moses and the Fall of New York
723–726, 738, 740–741, 775, 799, 927 (1975); M. Royko, Boss:
Richard J. Daley of Chicago 69 (1971); Wolfinger, Why Politi-
cal Machines Have Not Withered Away and Other Revision-
ist Thoughts, 34 J. Politics 365, 367–368, 372, 389 (1972); The
Bond Game Remains the Same, Nat. L. J., July 1, 1996,
pp. A1, A20–A21. If that long and unbroken tradition of our
people does not decide these cases, then what does? The
constitutional text is assuredly as susceptible of one meaning
as of the other; in that circumstance, what constitutes a "law
abridging the freedom of speech" is either a matter of history
or else it is a matter of opinion. Why are not libel laws such
an "abridgment"? The only satisfactory answer is that they
never were. What secret knowledge, one must wonder, is
breathed into lawyers when they become Justices of this
Court, that enables them to discern that a practice which the

text of the Constitution does not clearly proscribe, and which our people have *regarded* as constitutional for 200 years, is in fact unconstitutional?

The Court seeks to avoid the charge that it ignores the centuries-old understandings and practices of our people by recounting, *Umbehr, ante,* at 681–683, shocking examples of raw political patronage in contracting, most of which would be unlawful under the most rudimentary bribery law. (It selects, of course, only the worst examples from the sources I have cited, omitting the more common practices that permit one author to say, with undeniable accuracy, that "honorable and prudent businessmen competing for government ventures make campaign contributions" out of "a desire to do what [is] thought necessary to remain eligible," and that "[m]any contractors routinely do so to both parties." Heard, *supra,* at 145.) These "examples of covert, widely condemned, and sometimes illegal government action," it says, do not "legitimize the government discrimination." *Umbehr, ante,* at 683. But of course it is not the *county's* or *city's* burden (or mine) to "legitimize" all patronage practices; it is Umbehr's and O'Hare's (and the Court's) to show that all patronage practices are *not only* "illegitimate" in some vague moral or even precise legal sense, but *that they are unconstitutional.* It suffices to demonstrate the error of the Court's opinions that *many* contracting patronage practices have been open, widespread, and unchallenged since the beginning of the Republic; and that those that *have* been objected to have not been objected to *on constitutional grounds.* That the Court thinks it relevant that many patronage practices are "covert, widely condemned and sometimes illegal" merely displays its persistent tendency to equate those many things that are or should be proscribed as a matter of social policy with those few things that *we* have the power to proscribe under the Constitution. The relevant and inescapable point is this: No court ever held,

and indeed no one ever thought, prior to our decisions in *Elrod* and *Branti*, that patronage contracting could violate *the First Amendment.* The Court's attempt to contest this point, or at least to becloud the issue, by appeal to obnoxious and universally condemned patronage practices simply displays the feebleness of its case.

In each case today, the Court observes that we "have long since rejected Justice Holmes' famous dictum, that a policeman 'may have a constitutional right to talk politics, but he has no constitutional right to be a policeman.'" *Umbehr, ante,* at 674 (quoting *McAuliffe* v. *Mayor of New Bedford,* 155 Mass. 216, 220, 29 N. E. 517 (1892)); see *O'Hare, post,* at 716–717 (quoting same). But this activist Court also repeatedly rejects a more important aphorism of Justice Holmes, which expresses a fundamental philosophy that was once an inseparable part of our approach to constitutional law. In a case challenging the constitutionality of a federal estate tax on the ground that it was an unapportioned direct tax in violation of Article I, § 9, Justice Holmes wrote:

> "[The] matter . . . is disposed of . . . , not by an attempt to make some scientific distinction, which would be at least difficult, but on an interpretation of language by its traditional use—on the practical and historical ground that this kind of tax always has been regarded as the antithesis of a direct tax . . . . *Upon this point a page of history is worth a volume of logic."* *New York Trust Co.* v. *Eisner,* 256 U. S. 345, 349 (1921) (emphasis added).

## II

The Court's decision to enter this field cannot be justified by the consideration (if it were ever a justification) that the democratic institutions of government have not been paying adequate attention to the problems it presents. The American people have evidently decided that political influence in government contracting, like many other things that are

entirely constitutional, is not entirely desirable, and so they have set about passing laws to prohibit it in some but not all instances. As a consequence, government contracting is subject to the most extraordinary number of laws and regulations at the federal, state, and local levels.

The United States Code contains a categorical statutory prohibition on political contributions by those negotiating for or performing contracts with the Federal Government, 2 U. S. C. § 441c, competitive bidding requirements for contracts with executive agencies, 41 U. S. C. §§ 252–253, public corruption and bribery statutes, e. g., 18 U. S. C. § 201, and countless other statutory requirements that restrict Government officials' discretion in awarding contracts. "There are already over four thousand individual statutory provisions that affect the [Defense Department's] procurement process." Pyatt, Procurement Competition at Work: The Navy's Experience, 6 Yale J. Reg. 319, 319–320 (1989). Federal regulations are even more widespread. As one handbook in the area has explained, "[t]heir procedural and substantive requirements dictate, to an oftentimes astonishing specificity, how the entire contracting process will be conducted." ABA General Practice Section, Federal Procurement Regulations: Policy, Practice and Procedures 1 (1987). That is why it is no surprise in this area to find a 253-page book just setting forth "fundamentals," E. Massengale, Fundamentals of Federal Contract Law (1991), or a mere "deskbook" that runs 436 pages, ABA Section of Public Contract Law, Government Contract Law: The Deskbook for Procurement Professionals (1995). Such "summaries" are indispensable when, for example, the regulations that constitute the "Federal Acquisition Regulations System" total some *5,037* pages of fine print. See Title 48 CFR (1995).

Similar systems of detailed statutes and regulations exist throughout the States. In addition to the various statutes criminalizing bribes to government officials and other forms

of public corruption, all 50 States have enacted legislation imposing competitive bidding requirements on various types of contracts with the government.[1]  Government contract-

---

[1] See, e. g., Ala. Code § 11–43C–70 (1989); id., § 24–1–83 (1992); id., § 41–16–20 (Supp. 1995); Alaska Stat. Ann. § 36.30.100 (1992); Ariz. Rev. Stat. Ann. § 41–2533 (1992); Ark. Code Ann. §§ 14–47–120, 14–47–138, 14–48–117, 14–48–129 (1987); Cal. Pub. Cont. Code Ann. §§ 10302, 10309, 10373, 10501, 10507.7, 20723, 20736, 20751, 20803, 20921, 21501, 21631 (West 1985 and Supp. 1996); Cal. Pub. Util. Code Ann. § 131285 (West 1991); Cal. Rev. & Tax. Code Ann. § 674 (West Supp. 1996); Colo. Rev. Stat. § 24–103–202 (Supp. 1995); Conn. Gen. Stat. § 4a–57 (Supp. 1996); Del. Code Ann., Tit. 9, § 671 (1989); id., Tit. 29, § 6903(a) (1991); Fla. Stat. § 190.033 (Supp. 1996); id., § 287.057 (1991 and Supp. 1996); Ga. Code Ann. § 2–10–10 (1990); id., §§ 32–10–7, 32–10–68 (1991 and Supp. 1995); Haw. Rev. Stat. § 103D–302 (Supp. 1995); Idaho Code § 33–1510 (1995); id., § 43–2508 (Supp. 1995); id., § 50–1710 (1994); id., § 67–5711C (1995); id., § 67–5718 (1995, and 1996 Idaho Sess. Laws, ch. 198); Ill. Comp. Stat., ch. 50, § 20/20 (1993); id., ch. 65, § 5/8–10–3 (1993); id., ch. 70, §§ 205/25, 225/25, 265/25, 280/1–24, 280/2–24, 290/26, 310/5–24, 320/1–25, 320/2–25, 325/1–24, 325/2–24, 325/3–24, 325/5–24, 325/6–24, 325/7–24, 325/8–24, 340/25, 2305/11, 2405/11, 2805/14, 2905/5–4 (1993 and Supp. 1996); Ind. Code §§ 2–6–1.5–2, 10–7–2–28, 4–13.6–5–2, 8–16–3.5–5.5 (Supp. 1995); Iowa Code § 18.6 (1995); Kan. Stat. Ann. § 49–417(a) (Supp. 1990); id., §§ 75–3739 to 75–3741 (1989 and Supp. 1990, and 1996 Kan. Sess. Laws, ch. 201); Ky. Rev. Stat. Ann. § 162.070 (Baldwin 1990); La. Rev. Stat. Ann. § 39:1594 (West 1989); Me. Rev. Stat. Ann., Tit. 5, §§ 1743, 1743–A (1989); Md. Ann. Code, Art. 25, § 3(l) (Supp. 1995, and 1996 Md. Laws, ch. 66); id., Art. 25A, § 5(F) (Supp. 1995); Md. Nat. Res. Code Ann. §§ 3–103(g)(3), 8–1005(c) (Supp. 1995); Mass. Gen. Laws §§ 149–44A to 149–44M (1989 and Supp. 1996); Mich. Comp. Laws Ann. § 247.661c (West Supp. 1996); Minn. Stat. § 16B.07 (1988 and Supp. 1996); Miss. Code Ann. § 27–35–101 (1995); id., §§ 31–7–13, 37–151–17 (Supp. 1995); Mo. Rev. Stat. §§ 34.040.1, 34.042.1, 68.055.1 (Supp. 1996); Mont. Code Ann. §§ 7–3–1323, 7–5–2301, 7–5–2302, 7–5–4302, 7–14–2404 (1995); Neb. Rev. Stat. §§ 81–885.55, 84–1603 (1994); Nev. Rev. Stat. § 332.065 (1984); N. H. Rev. Stat. Ann. § 28:8 (1988); id., § 186–C:22(VI) (Supp. 1995); id., § 228:4 (1993); N. J. Stat. Ann. § 28:1–7 (West 1981); N. M. Stat. Ann. § 13–1–102 (1992); N. Y. Alt. County Govt. Law § 401 (McKinney 1993); N. Y. Gen. Mun. Law § 103 (McKinney 1986 and Supp. 1996); N. C. Gen. Stat. § 133–10.1 (1995); id., § 143–49 (1993); N. D. Cent. Code § 54–44.4–05 (Supp. 1995); Ohio Rev. Code Ann. §§ 307.90, 511.12 (1994); id., § 3381.11 (1995); Okla. Stat., Tit. 11, § 24–114 (1994); id., Tit. 52, § 318 (1991); id., Tit. 61, § 101 (1989); Ore. Rev.

ing is such a standard area for state regulation that a model procurement code has been developed, which is set forth in a 265-page book complete with proposed statutes, regulations, and explanations. See ABA Section of Urban, State and Local Government Law, Model Procurement Code for State and Local Governments (1981). As of 1989, 15 States had enacted legislation based on the model code. See ABA Section of Urban, State and Local Government Law, Annotations to the Model Procurement Code vii–viii (2d ed. 1992) (and statutes cited).

By 1992, more than 25 local jurisdictions had also adopted legislation based on the Model Procurement Code, see *id.*, at ix, and thousands of other counties and municipalities have over time devised their own measures. New York City, for example, which "[e]ach year . . . enter[s] into approximately 40,000 contracts worth almost $6.5 billion," has regulated the public contracting process by a myriad of codes and regulations that seek to assure "scrupulous neutrality in choosing contractors and [consequently impose] multiple layers of investigation and accountability." Anechiarico & Jacobs, Purging Corruption from Public Contracting: The 'Solutions' Are Now Part of the Problem, 40 N. Y. L. S. L. Rev. 143, 143–144 (1995) (hereinafter Anechiarico & Jacobs).

These examples of federal, state, and local statutes, codes, ordinances, and regulations could be multiplied to fill many volumes. They are the way in which government contracts

Stat. § 279.015 (1991); 53 Pa. Cons. Stat. § 23308.1 (Supp. 1996); R. I. Gen. Laws § 45–55–5 (Supp 1995); S. C. Code Ann. § 11–35–1520 (Supp. 1995); S. D. Codified Laws §§ 5–18–2, 5–18–3 (1994); *id.*, § 5–18–9 (Supp. 1996); *id.*, §§ 9–42–5, 11–7–44 (1995); *id.*, § 13–49–16, 42–7A–5 (1991); Tenn. Code Ann. §§ 12–3–202, 12–3–203, 12–3–1007 (1992 and Supp. 1995); Tex. Educ. Code Ann. § 51.907 (1987); Tex. Loc. Govt. Code Ann. §§ 252.021, 262.023, 262.027, 271.027, 375.221 (1988 and Supp. 1996); Utah Code Ann. § 17A–2–1195 (1991); Vt. Stat. Ann., Tit. 29, § 152(12) (1986); Va. Code Ann. §§ 11–41, 11–41.1 (1993); Wash. Rev. Code §§ 28A.160.140, 36.32.250 (Supp. 1996); W. Va. Code §§ 4–7–7, 5–6–7 (1994); Wis. Stat. § 30.32 (1989 and Supp. 1995); *id.*, § 60.47 (1988 and Supp. 1995); Wyo. Stat. § 35–2–429 (1994).

have been regulated, and the way in which public policy problems that arise in the area have been addressed, since the founding of the Republic. See, *e. g.,* Federal Procurement Regulations: Policy, Practice and Procedures, at 11–196 (describing the history of Federal Government procurement regulation). But these laws and regulations have brought to the field a degree of discrimination, discernment, and predictability that cannot be achieved by the blunt instrument of a constitutional prohibition.

Title 48 of the Code of Federal Regulations would not contain the 5,000+ pages it does if it did not make fine distinctions, permitting certain actions in some Government acquisition areas and prohibiting them in others. Similarly, many of the competitive bidding statutes that I have cited contain exceptions for, or are simply written not to include, contracts under a particular dollar amount,[2] or those covering certain subject matters,[3] or those that are time sensitive.[4]   A politi-

---

[2] See, *e. g.,* 41 U. S. C. §§ 252a(b), 403(11) (certain federal contracting laws rendered inapplicable "to a contract or subcontract that is not greater than" $100,000); Cal. Pub. Cont. Code Ann. § 10507.7 (West Supp. 1996) (lowest-responsible-bidder requirement for certain goods and materials only applicable to "contracts involving an [annual] expenditure of more than fifty thousand dollars"); Ill. Comp. Stat., ch. 50, § 20/20 (1993) (lowest-responsible-bidder requirement for certain construction contracts not applicable to contracts for more than $5,000); N. Y. Gen. Mun. Law § 103.1 (McKinney Supp. 1996) (not covering public-work contracts for $20,000 or less or purchase contracts for $10,000 or less); S. D. Codified Laws § 5–18–3 (Supp. 1996) (requiring competitive bidding process for certain public-improvement contracts "involv[ing] the expenditure of twenty-five thousand dollars or more"); Tex. Loc. Govt. Code Ann. § 262.023(a) (Supp. 1996) (applying only to "a contract that will require an expenditure exceeding $15,000").

[3] See, *e. g.,* Idaho Code § 33–1510 (1995); N. J. Stat. Ann. § 28:1–7 (West 1981); Ohio Rev. Code Ann. § 511.12 (Supp. 1995); Okla. Stat., Tit. 52, § 318 (1991); Utah Code Ann. § 17A–2–1195 (1991).

[4] See, *e. g.,* Del. Code Ann., Tit. 29, § 6903(a)(2) (1991); Fla. Stat. § 287.057(3)(a) (Supp. 1996); Minn. Stat. § 16B.08(6) (1988); N. H. Rev. Stat. Ann. § 228:4(I)(e) (1993); Tenn. Code Ann. §§ 12–3–202(3), 12–3–206 (1992).

cal unit's decision not to enact contracting regulations, or to suspend the regulations in certain circumstances, amounts to a decision to permit some degree of political favoritism. As I shall discuss shortly, *O'Hare*'s and *Umbehr*'s First Amendment permits no such selectivity—or at least none that can be known before litigation is over.

## III

If inattention by the democratic organs of government is not a plausible reason for the Court's entry into the field, then what is? I believe the Court accepts (any sane person *must* accept) the premise that it is utterly impossible to erect, and enforce through litigation, a system in which *no* citizen is intentionally disadvantaged by the government because of his political beliefs. I say the Court accepts that, because the *O'Hare* opinion, in a rare brush with the real world, points out that "O'Hare was not part of a constituency that must take its chance of being favored or ignored in the larger political process—for example, by residing or doing business in a region the government rewards or spurns in the construction of public works." *Post*, at 720–721. Of course. Government favors those who agree with its political views, and disfavors those who disagree, every day—in where it builds its public works, in the kinds of taxes it imposes and collects, in its regulatory prescriptions, in the design of its grant and benefit programs—in a *million* ways, including the letting of contracts for government business. What good reason has the Court given for separating out this last way, and declaring it to be (as all the others for some reason are not) an "abridgment of the freedom of speech"?

As I have explained, I would separate the permissible from the impermissible on the basis of our Nation's traditions, which is what I believe sound constitutional adjudication requires. In *Elrod* and *Branti*, the Court rejected this criterion—but if what it said did not make good constitutional law, at least it made some sense: the loss of one's job

is a powerful price to pay for one's politics. But the Court then found itself on the fabled slippery slope that Justice Holmes's aphorism about history and logic warned about: one logical proposition detached from history leads to another, until the Court produces a result that bears no resemblance to the America that we know. The next step was *Rutan*, which extended the prohibition of political motivation from firing to hiring. The third step is today's *Umbehr*, which extends it to the termination of a government contract. And the fourth step (as I shall discuss anon) is today's *O'Hare*, which extends it to the refusal to enter into contractual relationships.

If it is to be possible to dig in our cleats at some point on this slope—before we end up holding that the First Amendment requires the city of Chicago to have as few potholes in Republican wards (if any) as in Democratic ones—would not the most defensible point of termination for this indefensible exercise be public employment? A public employee is always an individual, and a public employee below the highest political level (which is exempt from *Elrod*) is virtually always an individual who is not rich; the termination or denial of a public job is the termination or denial of a livelihood. A public contractor, on the other hand, is usually a corporation; and the contract it loses is rarely its entire business, or even an indispensable part of its entire business. As Judge Posner put it:

> "Although some business firms sell just to government, most government contractors also have private customers. If the contractor does not get the particular government contract on which he bids, because he is on the outs with the incumbent and the state does not have laws requiring the award of the contract to the low bidder (or the laws are not enforced), it is not the end of the world for him; there are other government entities to bid to, and private ones as well. It is not like losing

your job." *LaFalce* v. *Houston*, 712 F. 2d 292, 294 (CA7 1983).

Another factor that suggests we should stop this new enterprise at government employment is the much greater volume of litigation that its extension to the field of contracting entails. The government contracting decisions worth litigating about are much more numerous than the number of personnel hirings and firings in that category; and the litigation resources of contractors are infinitely more substantial than those of fired employees or rejected applicants. Anyone who has had even brief exposure to the intricacies of federal contracting law knows that a lawsuit is often used as a device to stay or frustrate the award of a contract to a competitor. See, *e. g., Delta Data Systems Corp.* v. *Webster*, 744 F. 2d 197 (CADC 1984); *Delta Data Systems Corp.* v. *Webster*, 755 F. 2d 938 (CADC 1985). What the Court's decisions today mean is that all government entities, no matter how small, are at risk of § 1983 lawsuits for violation of constitutional rights, unless they adopt (at great cost in money and efficiency) the detailed and cumbersome procedures that make a claim of political favoritism (and a § 1983 lawsuit) easily defended against.

The Court's opinion in *O'Hare* shrugs off this concern with the response that "[w]e have no reason to believe that governments cannot bear a like burden [to that in the employment context] in defending against suits alleging the denial of First Amendment freedoms to public contractors." *Post*, at 724. The burden is, as I have suggested, likely much greater than that in the employment context; and the relevant question (if one rejects history as the determinant) is not simply whether the governments "can bear" it, but whether the inconvenience of bearing it is outbalanced by the degree of abridgment of supposed First Amendment rights (of corporate shareholders, for the most part) that

would occur if the burden were not imposed.[5]  The Court in *Umbehr* dismisses the risk of litigation, not by analogy to the employment context, but by analogy to the many government-contracting laws of the type I have discussed. "We are aware," it says, "of no evidence of excessive or abusive litigation under such provisions."  *Ante,* at 684. I am not sure the Court *would* be aware of such evidence if it existed, but if in fact litigation has been "nonexcessive" (a conveniently imprecise term) under these provisions, that is scant indication that it will be "nonexcessive" under the First Amendment.  Uncertainty breeds litigation. Government-contracting laws are clear and detailed, and whether they have been violated is typically easy to as-

---

[5] *O'Hare* makes a brief attempt to minimize the seriousness of the litigation concern, pointing out that "[t]he *amicus* brief filed on behalf of respondents' position represents that in the six years since our opinion in *[Rutan]* . . . only 18 suits alleging First Amendment violations in employment decisions have been filed against Illinois state officials."  *Post,* at 724.  In fact the brief said "*at least* eighteen cases," Brief for Illinois State Officials as *Amici Curiae* 3 (emphasis added), and that includes only suits against state officials, and not those against the officials of Illinois' 102 counties or its even more numerous municipalities.  Those statistics pertain to *employment* suits, moreover—and as I have discussed, the contracting suits will be much more numerous.

*O'Hare* also says that "we have found no reported case in the Tenth Circuit involving a First Amendment patronage claim by an independent contractor in the six years since its Court of Appeals first recognized such claims, see *Abercrombie* v. *Catoosa,* 896 F. 2d 1228 (1990)."  *Post,* at 724. With respect, *Abercrombie* (which discussed this issue in two short paragraphs) was such an obscure case that even the District Court in *Umbehr,* located in the Tenth Circuit, did not cite it, though it discussed cases in other jurisdictions.  *Umbehr* v. *McClure,* 840 F. Supp. 837 (Kan. 1993). And when the Tenth Circuit reversed the District Court, it did not do so on the basis of *Abercrombie*—which, it noted, had "*simply assumed* that an independent contractor could assert a First Amendment retaliation claim" and had given "little reasoning" to the matter but merely so "suggested, without analysis."  44 F. 3d 876, 880 (1995) (emphasis added). *Abercrombie* was, in short, such a muffled clarion that even the courts did not hear it, much less the public at large.

certain: the contract was put out for bid, or it was not. *Umbehr*'s new First Amendment, by contrast, requires a sensitive "balancing" in each case; and the factual question whether political affiliation or disfavored speech was the reason for the award or loss of the contract will usually be litigable. In short, experience under the government-contracting laws has little predictive value.

The Court additionally asserts that the line cannot be drawn between employment and independent contracting, because " 'the applicability of a provision of the Constitution has never depended on the vagaries of state or federal law.' " *Umbehr, ante,* at 680 (quoting *Browning-Ferris Industries of Vt., Inc.* v. *Kelco Disposal, Inc.,* 492 U. S. 257, 299 (1989) (O'CONNOR, J., concurring in part and dissenting in part)); see also *Umbehr, ante,* at 678–680 (citing other cases). That is not so. State law frequently plays a dispositive role in the issue whether a constitutional provision is applicable. In fact, before we invented the First Amendment right not to be fired for political views, most litigation in this very field of government employment revolved around the Fourteenth Amendment's Due Process Clause and asked whether the firing had deprived the plaintiff of a "property" interest without due process. And what is a property interest entitled to Fourteenth Amendment protection? "[P]roperty interests," we said, "are not created by the Constitution. Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law . . . . If it is the law of Texas that a teacher in the respondent's position has no contractual or other claim to job tenure, the respondent's [federal constitutional] claim would be defeated." *Perry* v. *Sindermann,* 408 U. S. 593, 602, n. 7 (1972) (internal quotation marks and citation omitted). See also *Mt. Healthy City Bd. of Ed.* v. *Doyle,* 429 U. S. 274, 280–281 (1977) (whether a government entity possesses Eleventh Amendment immunity "depends,

at least in part, upon the nature of the entity created by state law").

I have spoken thus far as though the only problem involved here were a practical one: as though, in the best of all possible worlds, if our judicial system and the resources of our governmental entities could only manage it, it would be *desirable* for an individual to suffer *no disadvantage whatever* at the hands of the government solely because of his political views—no denial of employment, no refusal of contracts, no discrimination in social programs, not even any potholes. But I do not believe that. The First Amendment guarantees that you and I can say and believe whatever we like (subject to a few tradition-based exceptions, such as obscenity and "fighting words") without going to jail or being fined. What it *ought* to guarantee beyond that is not at all the simple question the Court assumes. The ability to discourage eccentric views through the mild means that have historically been employed, and that the Court has now set its face against, may well be important to social cohesion. To take an uncomfortable example from real life: An organization (I shall call it the White Aryan Supremacist Party, though that was not the organization involved in the actual incident I have in mind) is undoubtedly entitled, under the Constitution, to maintain and propagate racist and antisemitic views. But when the Department of Housing and Urban Development lets out contracts to private security forces to maintain law and order in units of public housing, must it really treat this bidder the same as all others? Or may it determine that the views of this organization are not political views that it wishes to "subsidize" with public funds, nor political views that it wishes to hold up as an exemplar of the law to the residents of public housing?

The state and local regulation I described earlier takes account of this reality. Even where competitive-bidding requirements are applicable (which is far from always), they almost invariably require that a contract be awarded not to

the lowest bidder but to the "lowest *responsible* bidder."[6] "The word 'responsible' is as important as the word 'lowest,'" H. Cohen, Public Construction Contracts and the Law 81 (1961), and has been interpreted in some States to permit elected officials to exercise political discretion. "Some New York courts," for example, "have upheld agency refusals to award a contract to a low bidder because the contractor, while technically and financially capable, was not morally responsible." Anechiarico & Jacobs 146–147. In the leading case of *Picone* v. *New York*, 176 Misc. 967, 29 N. Y. S. 2d 539 (Sup. Ct. N. Y. Cty. 1941), the court stated that in determining whether a lowest bidder for a particular contract was the "lowest responsible bidder," New York City officials had permissibly considered "whether [the bidder] possessed integrity and moral worth." *Id.*, at 969, 29 N. Y. S. 2d, at 541. The New Jersey Supreme Court has similarly said: "It is settled that the legislative mandate that a bidder be 'responsible' embraces moral integrity just as surely as it embraces a capacity to supply labor and materials." *Trap Rock Industries, Inc.* v. *Kohl*, 59 N. J. 471, 481, 284 A. 2d 161, 166 (1971). In the future, presumably, this will be permitted only if the disfavored moral views of the bidder have never been verbalized, for otherwise the First Amendment will produce entitlement to the contract, or at least guarantee a lawsuit.

In treading into this area, "we have left the realm of law and entered the domain of political science." *Rutan*, 497 U. S., at 113 (SCALIA, J., dissenting). As Judge Posner rightly perceived, the issue that the Court today disposes of like some textbook exercise in logic "raises profound questions of political science that exceed judicial competence to answer." *LaFalce* v. *Houston*, 712 F. 2d, at 294.

---

[6] See, *e. g.*, Cal. Pub. Cont. Code Ann. §§ 10302, 10507.7, 20803 (West 1985 and Supp. 1996); Ill. Comp. Stat., ch. 50, §§ 20/20, 25/3; *id.*, ch. 70, §§ 15/8, 15/9, 205/25, 220/1–24, 220/2–24 (1993); N. Y. Gen. Mun. Law § 103.1 (McKinney Supp. 1996).

## IV

If, however, the Court is newly to announce that it has discovered that the granting or withholding of a contract is a First Amendment issue, a coherent statement of the new law is the least that those who labor in the area are entitled to expect. They do not get it from today's decisions, which contradict each other on a number of fundamental points.

The decision in *Umbehr* appears to be an improvement on our *Elrod-Branti-Rutan* trilogy in one sense. *Rutan*, the most recent of these decisions, provided that the government could justify patronage employment practices only if it proved that such patronage was "narrowly tailored to further vital governmental interests." 497 U. S., at 74. The four of us in dissent explained that "[t]hat strict-scrutiny standard finds no support in our cases," and we argued that, if the new constitutional right was to be invented, the criterion for violation should be "the test announced in *Pickering* [v. *Board of Ed. of Township High School Dist. 205, Will Cty.*, 391 U. S. 563 (1968)]." *Id.*, at 98, 100 (opinion of SCALIA, J.). It thus appears a happy development that the Court in *Umbehr* explicitly *rejects* the suggestion, urged by Umbehr and by the United States as *amicus curiae*, that "on proof of viewpoint-based retaliation for contractors' political speech, the government should be required to justify its actions as narrowly tailored to serve a compelling state interest," *ante*, at 676; accord, *ante*, at 678, and instead holds "that the *Pickering* balancing test, adjusted to weigh the government's interests as contractor rather than as employer, determines the extent of [independent contractors'] protection" under the First Amendment, *ante*, at 673. *Pickering* balancing, of course, requires a case-by-case assessment of the government's and the contractor's interests. "*Pickering* and its progeny ... involve a *post hoc* analysis of one employee's speech and its impact on that employee's public responsibilities." *United States* v. *Treasury Employees*, 513 U. S. 454, 466–467 (1995). See also *id.*, at 480–481 (O'CONNOR,

J., concurring in judgment in part and dissenting in part) (*Pickering* requires "case-by-case application"); *Rankin* v. *McPherson*, 483 U. S. 378, 388–392 (1987); *Connick* v. *Myers*, 461 U. S. 138, 150–154 (1983); *Pickering* v. *Board of Ed. of Township High School Dist. 205, Will Cty.*, 391 U. S. 563, 568–573 (1968). It is clear that this is what the Court's opinion in *Umbehr* anticipates: "a *fact-sensitive* and deferential weighing of the government's legitimate interests," *ante*, at 677 (emphasis added), which accords "[d]eference . . . to the government's reasonable assessments of its interests as contractor," *ante*, at 678 (emphasis deleted). "[S]uch a nuanced approach," *Umbehr* says, "which recognizes the variety of interests that may arise in independent contractor cases, is superior to a bright-line rule." *Ibid.*

What the Court sets down in *Umbehr*, however, it rips up in *O'Hare*. In Part III of that latter opinion, where the Court makes its application of the First Amendment to the facts of the case, there is to be found not a single reference to *Pickering*. See *post*, at 720–726. Indeed, what is quite astonishing, the Court concludes that it "need not inquire" into any government interests that patronage contracting may serve—even generally, much less in the particular case at hand—"for *Elrod* and *Branti* establish that patronage does not justify the coercion of a person's political beliefs and associations." *Post*, at 718. Leaving aside that there is no coercion here,[7] the assertion obviously contradicts the need for "balancing" announced in the companion *Umbehr* decision. This rejection of "balancing" is evident elsewhere in *O'Hare*—as when the Court rejects as irrelevant the Seventh

---

[7] As the dissenters in *Rutan* v. *Republican Party of Ill.*, 497 U. S. 62 (1990), agreed: "[I]t greatly exaggerates [the constraints entailed by patronage] to call them 'coercion' at all, since we generally make a distinction between inducement and compulsion. The public official offered a bribe is not 'coerced' to violate the law, and the private citizen offered a patronage job is not 'coerced' to work for the party." *Id.*, at 109–110 (SCALIA, J., dissenting).

Circuit's observation in *LaFalce* v. *Houston*, 712 F. 2d 292 (1983), that some contractors elect to "curr[y] favor with diverse political parties," on the ground that the fact "[t]hat some citizens [thus] find a way to mitigate governmental overreaching, or refrain from complaining, does not excuse wrongs done to those who exercise their rights." *Post*, at 724. But whether the government action at issue here *is* a "wrong" is precisely the issue in this case, which we thought (per *Umbehr*) was to be determined by "balancing."

One would have thought these two opinions the products of the courts of last resort of two different legal systems, presenting fertile material for a comparative-law course on freedom of speech were it not for a single paragraph in *O'Hare*, a veritable *deus ex machina* of legal analysis, which reconciles the irreconcilable. The penultimate paragraph of that portion of the *O'Hare* opinion which sets forth the general principles of law governing the case, see *post*, at 719, advises that henceforth "the freedom of speech" alluded to in the Bill of Rights will be divided into two categories: (1) the "right of free speech," where "we apply the balancing test from *Pickering*," and (since this "right of free speech" presumably does not exhaust the Free Speech Clause) (2) "political affiliation," where we apply the rigid rule of *Elrod* and *Branti*. The Court (or at least the *O'Hare* Court) says that "[t]here is an advantage in so confining the inquiry where political affiliation alone is concerned, for one's beliefs and allegiances ought not to be subject to probing or testing by the government." *Post*, at 719.

Frankly, the only "advantage" I can discern in this novel distinction is that it provides some explanation (no matter how difficult to grasp) of how these two opinions can issue from the same Court on the same day. It raises many questions. Does the "right of free speech" (category (1), that is) come into play if the contractor not only *is* a Republican, but *says*, "I am a Republican"? (At that point, of course,

the fatal need for "probing or testing" his allegiance disappears.) Or is the "right of free speech" at issue only if he goes still further, and says, "I believe in the principles set forth in the Republican platform"? Or perhaps one must decide whether the Rubicon between the "right of free speech" and the more protected "political affiliation" has been crossed on the basis of the contracting authority's *motivation*, so that it does not matter whether the contractor *says* he is a Republican, or even *says* that he believes in the Republican platform, so long as the reason he is disfavored is simply that (whatever he says or believes) he is a Republican. But the analysis would change, perhaps, if the contracting authority really has nothing against Republicans as such, but can't stand people who believe what the Republican platform stands for. Except perhaps it would *not* change if the contractor never actually *said* he was a Republican—or perhaps only if he never actually *said* that he believed in the Republican platform. The many variations will provide endless diversion for the courts of appeals.

If one is so sanguine as to believe that facts involving the "right of free speech" and facts involving "political affiliation" can actually be segregated into separate categories, there arises, of course, the problem of what to do when both are involved. One would expect the more rigid test (*Elrod* nonbalancing) to prevail. That is certainly what happens elsewhere in the law. If one is categorically liable for a *defamatory* statement, but liable for a *threatening* statement only if it places the subject in immediate fear of physical harm, an utterance that combines both ("Sir, I shall punch you in your lying mouth!") would be (at least as to the defamatory portion) categorically actionable. Not so, however, with our new First Amendment law. Where, we are told, "specific instances of the employee's speech or expression, which require balancing in the *Pickering* context, are intermixed with a political affiliation requirement," *balancing*

rather than categorical liability will be the result. *O'Hare, post,* at 719.

Were all this confusion not enough, the explanatory paragraph makes doubly sure it is not setting forth any comprehensible rule by adding, immediately after its description of how *Elrod,* rather than the *Pickering* balancing test, applies in "political affiliation" cases, the following: "It is true, on the other hand, . . . that the inquiry is whether the affiliation requirement is a reasonable one, so it is inevitable that some case-by-case adjudication will be required even where political affiliation is the test the government has imposed." *O'Hare, post,* at 719. As I said in *Rutan,* "[w]hat that means is anybody's guess." 497 U. S., at 111 (dissenting opinion). Worse still, we learn that *O'Hare* itself, where the Court does *not* conduct balancing, may "perhaps [be] includ[ed]" among "those many cases . . . which require balancing" because it is one of the "intermixed" cases I discussed in the paragraph immediately above. *Post,* at 719. Why, then, one is inclined to ask, did not the Court *conduct* balancing?

The answer is contained in the next brief paragraph of the *O'Hare* opinion:

> "The Court of Appeals, based on its understanding of the pleadings, considered this simply an affiliation case, and held, based on Circuit precedent, there was no constitutional protection for one who was simply an outside contractor. We consider the case in those same terms, but we disagree with the Court of Appeals' conclusion." *Post,* at 720.

This is a *deus ex machina* sent in to rescue the Court's *deus ex machina,* which was itself overwhelmed by the plot of this tragedy of inconsistency. Unfortunately, this *adjutor adjutoris* (to overextend, perhaps, my classical analogy) is also unequal to the task: The respondent in this case is entitled to defend the judgment in its favor on the basis of the facts *as they were alleged,* not as the Court of Appeals *took*

*them to be.* When, as here, "the decision we review adjudicated a motion to dismiss, we accept all of the factual allegations in petitioners' *complaint* as true and ask whether, in these circumstances, dismissal of the complaint was appropriate." *Berkovitz* v. *United States,* 486 U. S. 531, 540 (1988) (emphasis added). It is at least highly arguable that the complaint alleged what the Court calls a violation of the "right of free speech" rather than merely the right of "political affiliation." The count at issue was entitled **"FREEDOM OF SPEECH,"** see App. in No. 95–191, p. 15, and contended that petitioners had been retaliated against because of "the exercise of their constitutional right of freedom of speech," *id.,* at 17. One of the two central factual allegations is the following: "John A. Gratzianna openly supported Paxson's opponent for the office of Mayor. Campaign posters for Paxson's opponent were displayed at plaintiff O'Hare's place of business." *Id.,* at 16. It is particularly inexcusable to hide behind the Court of Appeals' treatment of this litigation as "simply an affiliation case," since when the Court of Appeals wrote its opinion the world had not yet learned that the Free Speech Clause is divided into the two categories of "right of free speech" and "political affiliation." As far as that court knew, it could have substituted "freedom of speech" for "freedom of political affiliation" whenever it used the term, with no effect on the outcome. It did not, in other words, remotely make a "finding" that the case involves only the right of political affiliation. Unavoidably, therefore, if what the *O'Hare* Court says in its first explanatory paragraph is to be believed—that is, what it says in the latter part of that paragraph, to the effect that "intermixed" cases are governed by *Pickering*—there is simply no basis for reversing the Court of Appeals *without* balancing, and directing that the case proceed, effectively depriving the city of its right to judgment on the pleadings.

Unless, of course, *Pickering* balancing can never support the granting of a motion to dismiss. That is the proposition

that today's *O'Hare* opinion, if it is not total confusion, must stand for. Nothing else explains how the Court can (1) assert that an "intermixed" case requires *Pickering* balancing, (2) acknowledge that the complaint here *may set forth* an "intermixed" case, and yet (3) reverse the dismissal without determining whether the complaint *does set forth* an "intermixed" case and, if so, proceeding to conduct at least a preliminary *Pickering* balancing. There is of course no reason in principle why this particular issue should be dismissal proof, and the consequence of making it so, given the burdens of pretrial discovery (to say nothing of trial itself) will be to make litigation on this subject even more useful as a device for harassment and weapon of commercial competition. It must be acknowledged, however, that proceeding this way in the present case has one unquestionable advantage: it leaves it entirely to the District Court to clean up, without any guidance or assistance from us, the mess that we have made—to figure out whether saying "Vote against Paxson," or "Paxson is a hack," or "Paxson's project for a 100,000-seat municipal stadium is wasteful," or whatever else Mr. Gratzianna's campaign posters might have said, removes this case from the Political Affiliation Clause of the Constitution and places it within the Right of Free Speech Clause.

One final observation about the sweep of today's holdings. The opinion in *Umbehr*, having swallowed the camel of First Amendment extension into contracting, in its penultimate paragraph demonstrates the Court's deep-down judicial conservatism by ostentatiously straining out the following gnat: "Finally, we emphasize the limited nature of our decision today. Because Umbehr's suit concerns the termination of a pre-existing commercial relationship with the government, we need not address the possibility of suits by bidders or applicants for new government contracts who cannot rely on such a relationship." *Ante*, at 685. The facts in *Umbehr*, of course, involved the termination of nothing so vague as a "commercial relationship with the government"; the Board

of Commissioners had terminated Umbehr's *contract.* The fuzzier terminology is used, presumably, because *O'Hare* did *not* involve termination of a contract. As far as appears, O'Hare had not paid or promised anything to be placed on a list of tow-truck operators who would be offered individual contracts as they came up. The company had no right to sue if the city failed to call it, nor the city any right to sue if the company turned down an offered tow. It had, in short, only what might be called (as an infinity of things might be called) "a pre-existing commercial relationship" with the city: it was one of the tow-truck operators they regularly called. The quoted statement in *Umbehr* invites the bar to believe, therefore, that the Court which declined to draw the line of First Amendment liability short of firing from government employment (*Elrod* and *Branti*), short of nonhiring for government employment *(Rutan)*, short of termination of a government contract *(Umbehr)*, and short of *denial* of a government contract to someone who had a "pre-existing commercial relationship with the government" *(O'Hare)* may take a firm stand against extending the Constitution into every little thing when it comes to denying a government contract to someone who had *no* "pre-existing commercial relationship." Not likely; in fact, not even believable.

This Court has begun to make a habit of disclaiming the natural and foreseeable jurisprudential consequences of its pathbreaking (*i. e.,* Constitution-making) opinions. Each major step in the abridgment of the people's right to govern themselves is portrayed as extremely limited or indeed *sui juris.* In *Romer* v. *Evans,* 517 U. S. 620, 632, 633 (1996), announced last month, the Court asserted that the Colorado constitutional amendment at issue was so distinctive that it "defies . . . conventional inquiry" and "confounds [the] normal process of judicial review." In *United States* v. *Virginia, ante,* at 534, n. 7, announced two days ago, the Court purported to address "specifically and only an educational opportunity recognized by the District Court and the Court of

Appeals as 'unique.'" And in the cases announced today, "we emphasize the limited nature of our decision." *Umbehr, ante,* at 685. The people should not be deceived. While the present Court sits, a major, undemocratic restructuring of our national institutions and mores is constantly in progress.

\*      \*      \*

They say hard cases make bad law. The cases before the Court today set the blood boiling, with the arrogance that they seem to display on the part of elected officials. Shall the American System of Justice let insolent, petty-tyrant politicians get away with this? What one tends to forget is that we have heard only the plaintiffs' tale. These suits were dismissed before trial, so the "facts" the Court recites in its opinions assume the truth of the allegations made (or the preliminary evidence presented) by the plaintiffs. We have no idea whether the allegations are true or false—but if they are true, they are certainly highly unusual. Elected officials do not thrive on arrogance.

For every extreme case of the sort *alleged* here, I expect there are thousands of contracts awarded on a "favoritism" basis that no one would get excited about. The Democratic mayor gives the city's municipal bond business to what is known to be a solid Democratic law firm—taking it away from the solid Republican law firm that had the business during the previous, Republican, administration. What else is new? Or he declines to give the construction contract for the new municipal stadium to the company that opposed the bond issue for its construction, and that in fact tried to get the stadium built across the river in the next State. What else would you expect? Or he awards the cable monopoly, not to the (entirely responsible) Johnny-come-lately, but to the local company that has always been a "good citizen"— which means it has supported with money, and the personal efforts of its management, civic initiatives that the vast majority of the electorate favor, though some oppose. Hooray!

Favoritism such as this happens all the time in American political life, and no one has ever thought that it violated— of all things—the First Amendment to the Constitution of the United States.

The Court must be living in another world. Day by day, case by case, it is busy designing a Constitution for a country I do not recognize. Depending upon which of today's cases one chooses to consider authoritative, it has either *(O'Hare)* thrown out vast numbers of practices that are routine in American political life in order to get rid of a few bad apples; or *(Umbehr)* with the same purpose in mind subjected those routine practices to endless, uncertain, case-by-case, balance-all-the-factors-and-who-knows-who-will-win litigation.

I dissent.