UNITED STATES of America

v.

SYSCO CORPORATION, et al.

No. Civ.A. CCB–98–351.

United States District Court, D. Maryland.

July 16, 1998.

vant to the IG's investigation into possible overcharges by Sysco on government contracts entered into with various agencies within DOD. The parties appeared for a hearing on June 30, 1998. Finding the requested materials relevant to the investigation, I will grant the petition.

## BACKGROUND

Over the course of roughly a decade, Sysco and its corporate subsidiaries entered into a number of contracts with DOD and its agencies to supply food and food service products, involving hundreds of thousands of sales and millions of dollars. The IG commenced an investigation (apparently in early 1996, although the record is not specific) into whether Sysco, fraudulently or otherwise, inflated its costs to recover additional monies not permitted under its contracts. On August 29, 1997 the IG issued five subpoenas seeking all records of transactions between Sysco and its suppliers as well as internal records of transactions between Sysco and its subsidiaries, pertaining to 253 specific products (a relatively small sample given the thousands of items) sold by Sysco to DOD under the contracts. Sysco only partially complied with the subpoenas and the government filed this petition for summary enforcement.

## ANALYSIS

Charles J. Peters, Assistant United States Attorney, Baltimore, MD, for plaintiff.

D. Michael Fitzhugh, McKenna & Cuneo, LLP, Washington, DC, Thomas M. Abbott, John A. Burkholder, McKenna & Cuneo, Los Angeles, CA, for defendants.

### MEMORANDUM

BLAKE, District Judge.

Now pending before me is the petition of the United States, on behalf of the Inspector General ("IG") of the Department of Defense ("DOD"), for summary enforcement of five administrative subpoenas. The subpoenas seek to compel respondents Sysco Corporation and four of its corporate subsidiaries (collectively "Sysco") to produce records rele-

The IG is authorized, in fulfilling its statutory duty to detect fraud, waste and abuse in federal programs, to require by subpoena "the production of all information, documents, reports, answers, records, accounts, papers and other data and documentary evidence necessary in the performance of the functions assigned by [the Inspector General Act of 1978]." 5 U.S.C.A.App. 3 § 6(a)(4) (1996). IG subpoenas are enforceable in a federal district court. *Id.* "In order to enforce [an administrative] subpoena, a court must be satisfied that the administrative agency has shown that:

(1) it is authorized to make such investigation;

(2) it has complied with statutory requirements of due process; and (3) the materials requested are relevant."

*EEOC v. Lockheed Martin Corp.*, 116 F.3d 110, 113 (4th Cir.1997) (quoting *EEOC v. City of Norfolk Police Dep't*, 45 F.3d 80, 82 (4th Cir.1995)) (internal quotation omitted). Sysco does not claim that the investigation is outside the IG's statutory authority, which authority is exceedingly broad, *see* Inspector General Act of 1978, 5 U.S.C.A.App. 3 §§ 1–12 (1996 & Supp.1998), or that the process accorded by the IG fell short of what was due. The sole issue, then, is whether the materials sought are relevant. (Sysco's argument that, because the materials are not relevant, the IG was not authorized to investigate them, is subsumed by the relevancy issue).

### 1. A Dispute Over Terminology—Is Sysco's "Cost" Relevant to the Government's Investigation?

■ Although the parties dispute the proper characterization of the price-setting mechanism contained in the contracts, it cannot be disputed, based upon the materials submitted to the court, that the price the government was to pay Sysco was based on and fluctuated with the amount Sysco paid to obtain the products. The government refers to this figure as Sysco's "cost," a characterization which Sysco claims is wrong. Sysco's argument is not persuasive.

The government claims that under the contracts the price the government was to pay for the products was the sum of what Sysco paid to obtain the product, i.e. Sysco's cost, plus a fixed percentage markup representing profit and overhead. (Gov't's Pet.Ex. A ¶ 3.) Sysco counters that under federal procurement law, percentage markups are illegal, *see* 48 C.F.R. § 12.007 (1997) ("Agencies shall use firm-fixed-price contracts or fixed-price contracts with economic price adjustment for the acquisition of commercial items.... Use of any other contract type to acquire commercial items is prohibited."). Regardless who has the better of the argument, Sysco's dispute with the government's characterization involves calculation of Sysco's markup, which is entirely irrelevant to the current dispute as framed by the subpoenas, namely, the proper calculation of what Sysco paid to obtain the product—in other words its "cost."

Despite counsel's claim at the hearing that the contracts show that Sysco's costs are irrelevant to the government's investigations, Sysco's own correspondence, as well as its submissions to this court, prove otherwise; moreover they repeatedly and specifically speak in the language of "cost." In a May 1, 1996 letter from Sysco to a DOD agency, Sysco quoted language from a DOD solicitation that was later incorporated into a contract between DOD and Sysco regarding the

> cost used by [Sysco] as the basis of the prices to [DOD]. The proposal defined the prime vendor's cost as follows:
>
> > "Cost" is defined as a Cost of the product as shown to Contractor or to any affiliate of Contractor ... plus applicable freight.

(Sysco's Surreply, Ex.A. at 2, Letter from Sysco to DOD regarding Contract No. SPO300–95–D–2803; *see also* Gov't's Hrg.Ex. 1, January 24, 1995 award of Contract No. SPO300–95–D–2803 to Sysco.) What the government terms "cost" was defined in this proposal (later incorporated into a contract) as the "delivered price" which, when added to the "distribution price," or the fixed markup Sysco was allowed to charge for overhead and profit, constituted the "unit price," or total price, charged to the government. Sysco's letter continues, quoting the government's proposal:

> The *delivered price* is defined as the actual invoice price of a product that the prime vendor [Sysco] has paid a manufacturer or supplier for that product delivered to their distribution point (sometimes referred to as "landed cost").

(Sysco's Surreply, Ex.A. at 3, Letter from Sysco to DOD regarding Contract No. SPO300–95–D–2803; *see also* Gov't's Hrg.Ex. 1, Contract No. SPO300–96–D–2901 (employing identical language to define "delivered price"); Gov't's Reply Ex. B, Contract No. F41999 91–D–6171, ¶ 4 ("The Contractor is to be reimbursed his landed costs (cost of products delivered to the Contractor's principal plant or the chargeout price from internal facilities if manufactured by the Contractor minus any promotional allowances or quantity allowances received from the manufacturer), plus a firm fixed fee.... The contractor

shall purchase products at a competitive price."); Gov't's Supp'l Reply Ex. 1, Letter from Sysco to Certain of Its Vendors of July 9, 1996, at 1, regarding the DOD investigation ("SYSCO clearly defines 'cost' to exclude 'earned income.' "); *id.* at 2 ("we are compelled to demand that our DOD customers resolve this inquiry by confirming our prior understandings and issuing a clear decision on the definition of cost and the treatment of 'earned income' "); *id.* at 3, excerpt from Sysco's master distribution agreement ("Receipt of ... earned income does not affect Cost and does not diminish SYSCO's commitment to provide competitive prices to its customers."); Sysco's Opp.Ex. B, June 20, 1997 decision of DOD Contracting Officer regarding interpretation of Contract No. SPO300–96–C–2803 at 1 ("Under the contract, the price paid by the Government is based upon the distribution price and the actual invoice price of a product that SYSCO pays a manufacturer or supplier for that product."); Sysco's Surreply Ex. B, Letter from Sysco to DOD of June 24, 1996 at 1–2 n. 1 ("The terms 'delivered price' and 'landed cost' (used in section B–2d of the solicitation), and 'cost' (used in our proposal) were defined as the cost of the product as shown on the invoice."); *id.* at 2–3 (requesting "confirm[ation] that we have an explicit agreement on the meaning of contract cost and price terms"); *id.* at 5 ("the total cost used to calculate prices to the government is based solely on the invoice cost reflected on invoices to the operating companies")).

Based upon the materials before the court, Sysco did not contract to sell food items to the government for a firm, fixed price, i.e. twenty-five cents for a can of beans; had it done so, then its cost probably would be irrelevant to a government investigation like the present one. Rather, the price Sysco was permitted to charge the government unquestionably was a function of, in part, the price Sysco paid to obtain the goods sold. Whether that price is termed "delivered price" or "cost" does not affect the relevance of the government's subpoenas, which seek to determine just what Sysco paid for those goods. When pressed at oral argument to explain how Sysco was to bill the government for the food items delivered under the con-

tracts without taking account of its cost, counsel for Sysco essentially replied that government contracting is complex and does not admit of easy explanation. While that may be true as a general matter, *see, e.g., Board of County Comm'rs v. Umbehr,* —— U.S. ——, ——, 116 S.Ct. 2361, 2364, 135 L.Ed.2d 843, (1996) (dissenting opinion of Scalia, J.) (" 'There are already over four thousand individual statutory provisions that affect the [Defense Department's] procurement process.' " (citation omitted)), it is clear that Sysco has long disputed and/or sought clarification with DOD of "the definition of cost and the treatment of 'earned income' " under the contracts. (Gov't's Supp'l Reply Ex. 1, Letter from Sysco to Certain of Its Vendors of July 9, 1996, at 2.) It is difficult to fathom why Sysco would so vehemently have contested proper definition of its costs if they were not relevant to the amount Sysco could charge the government for goods sold under the contracts. Sysco's "cost" of goods sold to the government is undoubtedly relevant to the government's investigation.

### 2. *"Earned Income"*

In essence Sysco's position is that the government is not allowed to look beyond the price stated on the face of the invoices for goods that Sysco purchased from other suppliers, regardless of the possibility that Sysco may have received discounts or rebates not reflected in the invoiced amount. In support of this position Sysco argues that in calculating its delivered price under the contracts, it was not required to credit the government for amounts it received as "earned income." According to Sysco, "earned income" is reimbursement and compensation for merchandising services provided to suppliers—as distinguished from rebates and discounts. Agreeing with Sysco, the Armed Services Board of Contract Appeals ruled, at least as to one contract, that earned income received by Sysco did not have to be credited, reasoning that such payments represent "reimbursement or compensation for actual merchandising services provided to suppliers," rather than discounts or rebates based on quantity purchases directly attributable to the government's purchases and required to

be passed along to the government under the "Rebates and Discount Clause." (Sysco's Opp.Ex. B, June 20, 1997 decision of DOD Contracting Officer regarding interpretation of Contract No. SPO300–96–C–2803, at 1.) The Comptroller General of the United States ruled similarly in the context of a protest by Sysco regarding alleged ambiguity in a DOD request for proposals. (Sysco's Opp.Ex. A.)

It may be assumed for purposes of this opinion that the rulings are correct as a matter of contract interpretation, without so deciding. Sysco, however, attempts to metamorphose these rulings, which concerned only the interpretation of a term of the contracts, to stand for the very different proposition that Sysco has been "determined in not one but *two* administrative proceedings to be in compliance with the terms of [its] contracts with Federal government agencies." (Sysco's Opp. at 2 (emphasis in original).) But because neither ruling purported to have examined the facts surrounding Sysco's performance under the contracts, Sysco's actual billing practices can in no way be seen to have been vindicated by them. The distinction ignored (or obfuscated) by Sysco is the elementary one between questions of law and of fact; for to say that "earned income" is not required to be passed on to the government under the contracts is not the same as saying that payments from suppliers retained by Sysco properly are so labeled. (*See* Sysco's Opp., Ex. A at 2, where the General Accounting Office, in responding to Sysco's protest to a solicitation for bids, stated its understanding of Sysco's position as follows: "The protesters [Sysco] explain that while it is customary in the industry for distributors to pass discounts and rebates from suppliers on to the customer, it is not customary to pass earned income through to the customer . . . .") [1] Sysco supposes that the subpoenas are unnecessary because the "documents sought by the subpoenas will only confirm what Sysco has already told the DOD IG: Sysco does not pass on to the Government the earned income it receives from its suppliers." (Sysco's Opp. at 9.) Sysco's unstated

premise—that the payments received from its suppliers are in fact earned income and thus properly excludable—is precisely a subject of the IG's investigation, and the IG is not required to accept Sysco's conclusion as to that question; indeed, Sysco's argument that the documents sought will only confirm that Sysco acted properly confirms their relevance to the government's investigation.

Shifting to a new tack on the same course, Sysco attempts to find in its contracts a prohibition on the government's ability to request the information it seeks. Sysco had at one time protested as ambiguous a DOD request for proposals and obtained a ruling from the Comptroller General of the United States stating that "[s]ince compensation earned for services performed [earned income] . . . is neither a discount nor rebate under these [requests for proposals], there is no requirement for tracking and reporting of such compensation." (Sysco's Opp.Ex. A at 3.) Thus, Sysco reasons, the IG has no power to request documents regarding its earned income. (Again, that the payments are properly so labeled is only Sysco's position and not a foregone conclusion.) The first and most basic problem with Sysco's argument is that Sysco has not shown this pre-award interpretation to correspond to a term of any of the contracts at issue. The government asserts, and Sysco does not contest, that Sysco did not receive the contract let under this particular request for proposals; and Sysco has provided nothing to tie this pre-award interpretation to any specific contract. But even if the contracts properly were interpreted not to require Sysco in the course of its performance to report its earned income (as opposed to discounts or rebates) to the agency, Sysco has provided no authority to demonstrate that such a term would also preclude the IG in the exercise of its statutory authority from investigating whether Sysco's characterization of certain payments as earned income was correct and, concomitantly, demanding production of documents rele-

1. Apparently, Sysco did not receive the contract let under this solicitation. (*See* Gov't's Reply at 5–6.)

vant to that inquiry by subpoena.[2]

### 3. Additional Contentions

Sysco also advances arguments exhibiting its concern with the length and manner of conduct of the investigation, asserting that it has already produced over 200,000 documents pertaining to this investigation and that the government has shown by its conduct that it has no sense of urgency in enforcing these subpoenas. To the extent that Sysco has already produced documents covered by the current subpoenas, the government has agreed to accept, at Sysco's option, either a reference to the Batestamped number of the document already in the government's possession, or a duplicate copy. As to Sysco's abandonment and delay arguments (to which the government does not acquiesce), while they may serve to demonstrate that " 'the expense and annoyance of litigation is part of the social burden of living under government,' " *Federal Trade Commission v. Standard Oil Co.*, 449 U.S. 232, 244, 101 S.Ct. 488, 495, 66 L.Ed.2d 416 (1980) (quoting *Petroleum Exploration, Inc. v. Public Service Comm'n*, 304 U.S. 209, 222, 58 S.Ct. 834, 841, 82 L.Ed. 1294 (1938)), they present no ground upon which relief from the subpoenas may be granted.[3]

### 4. Third–Party Subpoenas

 Finally, after this enforcement petition was fully briefed, Sysco by letter dated May 29, 1998 requested permission to brief similar issues it anticipates will arise from the government's issuance of seven subpoenas to third parties, six of whom are suppliers of Sysco, and the seventh is Arthur Andersen L.L.P., Sysco's outside accounting and internal auditing firm. As Sysco acknowledges, however, until the government seeks enforcement of the subpoenas, which are not self-executing, the issue is not ripe for review. *See Reisman v. Caplin*, 375 U.S. 440, 449–50, 84 S.Ct. 508, 513–14, 11 L.Ed.2d 459 (1964); *Atlantic Richfield Co. v. FTC*, 546 F.2d 646, 648–49 (5th Cir.1977). Sysco suggests that this principle should be set aside in the current circumstance where an enforcement proceeding is already before the court and the government has issued additional subpoenas to third parties. While this position may make some sense, I will decline to exercise discretion (assuming I would even have it) to permit the additional briefing. Sysco has identified no way in which it will be harmed or prejudiced by having to seek intervention in a separate enforcement proceeding, and it is conceivable that the third party served with the subpoena may wish to raise concerns separate from those advanced by Sysco. *See Abbott Laboratories v. Gardner*, 387 U.S. 136, 149, 87 S.Ct. 1507, 1515, 18 L.Ed.2d 681 (1967) (requiring court in deciding ripeness question "to evaluate both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration"); *Reisman*, 375 U.S. at 449, 84 S.Ct. at 513–14 (dismissing taxpayers' challenge to third-party subpoenas issued by the Internal Revenue Service, holding that taxpayers had adequate remedies at law which included intervention in any eventual enforcement proceeding).[4]

A separate Order follows.

---

**2.** "When it promulgated the IG Act, Congress took the extra measure to articulate its belief that the subpoena provision, section 6(a)(4), is an integral component, critical to fulfilling the IG Act's objectives:

> Subpoena power is absolutely essential to the discharge of the Inspector and Auditor General's functions. There are literally thousands of institutions in the country which are somehow involved in the receipt of funds from Federal programs. Without the power necessary to conduct a comprehensive audit of these entities the Inspector and Auditor General could have no serious impact on the way federal funds are expended.

S.Rep. 1071, 95th Cong., 2d Sess. 34 (1978), reprinted in 1978 U.S.C.C.A.N. 2676, 2709."
*United States v. First Nat'l Bank of Maryland*, 866 F.Supp. 884, 886–87 (D.Md.1994).

**3.** The government cites, as one example of Sysco's noncompliance with the subpoenas, Sysco's failure to produce "tear strips." Tear strips, which according to the government serve to set out rebates and allowances, are so named because they can be torn from an invoice. Sysco argues that in late 1993 it discontinued the use of tear strips, and that even when used they were not retained. Because it remains to be seen how the government may react to Sysco's failure to produce documents it claims either never existed or have long been discarded, the issue is not at this time ripe for review.

**4.** Subsequent to Sysco's request to brief the anticipated enforcement issues surrounding the seven third-party subpoenas, the government petitioned for enforcement of the Arthur Andersen subpoena. The case has been assigned to me.

## ORDER

For the reasons stated in the accompanying Memorandum, it is hereby Ordered that:

1. the government's petition for enforcement of Inspector General Subpoena is **GRANTED;**

2. Sysco, at its option, may produce any document which is covered by the subpoenas and has already been supplied to the government either by referring to the Batestamped number of the document already in the government's possession or by producing a duplicate of that document;

3. Sysco's request for supplemental briefing regarding additional subpoenas issued to third parties is **DENIED;**

4. copies of this Order and the accompanying Memorandum shall be mailed to counsel of record; and

5. the clerk of the court shall **CLOSE** this case.

So far as the record shows, Sysco has not yet moved to intervene in that enforcement proceeding. *See* No. CCB–98–1816 (D.Md., filed June 8, 1998). A copy of this memorandum is being sent to counsel for Arthur Andersen.