Justice Ginsburg,
with whom Justice Stevens joins, concurring in part and dissenting in part.
Bureau of Land Management (BLM) officials in Wyoming made a careless error. They failed to record an easement obtained for the United States along a stretch of land on the privately owned High Island Ranch. Plaintiff-respondent Frank Robbins purchased the ranch knowing nothing about the easement granted by the prior owner. Under Wyoming law, Robbins took title to the land free of the easement. BLM officials, realizing their mistake, demanded from Robbins an easement — for which they did not propose to pay— to replace the one they carelessly lost. Their demand, one of them told Robbins, was nonnegotiable. Robbins was directed to provide the easement, or else. When he declined to follow that instruction, the BLM officials mounted a seven-year campaign of relentless harassment and intimidation to force Robbins to give in. They refused to maintain *569 the road providing access to the ranch, trespassed on Robbins’ property, brought unfounded criminal charges against him, canceled his special recreational use permit and grazing privileges, interfered with his business operations, and invaded the privacy of his ranch guests on cattle drives.
Robbins commenced this lawsuit to end the incessant harassment and intimidation he endured. He asserted that the Fifth Amendment’s Takings Clause forbids government action calculated to acquire private property coercively and cost free. He further urged that federal officials dishonor their constitutional obligation when they act in retaliation for the property owner’s resistance to an uncompensated taking. In support of his claim for relief, Robbins relied on Bivens v. Six Unknown Fed. Narcotics Agents, 403 U. S. 388 (1971). The Court recognizes that the “remedy” to which the Government would confine Robbins — a discrete challenge to each offending action as it occurs — is inadequate. A remedy so limited would expose Robbins’ business to “death by a thousand cuts.” See ante, at 555 (quoting Brief for Respondent 40). Nevertheless, the Court rejects his claim, for it fears the consequences. Allowing Robbins to pursue this suit, the Court maintains, would open the floodgates to a host of unworthy suits “in every sphere of legitimate governmental action affecting property interests.” Ante, at 561.
But this is no ordinary case of “hard bargaining,” ante, at 560, or bureaucratic arrogance. Robbins charged “vindictive action” to extract property from him without paying a fair price. He complains of a course of conduct animated by an illegitimate desire to “get him.” That factor is sufficient to minimize the Court’s concern. Cf. Village of Willowbrook v. Olech, 528 U. S. 562, 565-566 (2000) (Breyer, J., concurring in result) (internal quotation marks omitted). Taking Robbins’ allegations as true, as the Court must at this stage of the litigation, the case presents this question: Does the Fifth Amendment provide an effective check on federal offi *570 cers who abuse their regulatory powers by harassing and punishing property owners who refuse to surrender their property to the United States without fair compensation? The answer should be a resounding “Yes.”
I
The Court acknowledges that, at this stage of proceedings, the facts must be viewed in the light most favorable to Robbins. Ante, at 543, n. 2. The full force of Robbins’ complaint, however, is not quite captured in the Court’s restrained account of his allegations. A more complete rendition of the saga that sparked this suit is in order.
Upon discovering that BLM had mistakenly allowed its easement across High Island Ranch to expire, BLM area manager Joseph Vessels contacted Robbins at his home in Alabama to demand that Robbins grant a new easement. Vessels was on shaky legal ground. A federal regulation authorized BLM to require a landowner seeking a right-of-way across Government land to grant reciprocal access to his own land. See 43 CFR §2801.1-2 (2004). But Robbins never applied for a right-of-way across federal land (the prior owner did), and the Government cites no law or regulation commanding Robbins to grant a new easement to make up for BLM’s neglect in losing the first one. Robbins was unwilling to capitulate to unilateral demands, but told Vessels he would negotiate with BLM when he moved to Wyoming. Vessels would have none of it: “This is what you’re going to do,” he told Robbins. Plaintiff-Appellee’s Supp. App. in No. 04-8016 (CA10), p. 325 (hereinafter CA10 App.).
Edward Parodi, a range technician in the BLM office, testified that from the very beginning, agency employees referred to Robbins as “the rich SOB from Alabama [who] got [the Ranch].” App. 121. Trouble started almost immediately. Shortly after their first conversation, Vessels wrote Robbins to ask permission to survey his land, presumably to establish the contours of the easement. Robbins refused, *571 believing there was no need for a survey until an agreement had been reached. Vessels conducted the survey anyway, and chuckled when he told Robbins of the trespass. CA10 App. 325-327. At their first face-to-face meeting in Wyoming, Robbins bridled at the one-sided deal BLM proposed. But Vessels was adamant: “The Federal Government does not negotiate,” he declared. Id., at 326. Over time, Parodi reported, Vessels’ attitude toward Robbins changed from “professional” to “hostile,” and “just got. worse and worse and worse.” App. 124.
Other BLM employees shared Vessels’ animosity. In one notable instance, Robbins alleged, BLM agent Gene Leone provoked a violent encounter between Robbins and a neighboring landowner, LaVonne Pennoyer. Leone knew Robbins was looking for a water source for his cattle, and he called Pennoyer to warn her to be on the lookout. Robbins, unfamiliar with the territory and possibly misled by BLM, drove cattle onto Pennoyer’s land to water at a creek. Pennoyer showed up in her truck, yelling, blowing the horn, and bumping cows. Realizing that he was on Pennoyer’s land, Robbins started to push his cows out of her way, when Pennoyer revved her engine and drove her truck straight into the horse Robbins was riding. Id., at 49; CA10 App. 331-332, 676-681; 9 Record, PI. Exh. 2, pp. 164-166; 10 id., PI. Exh. 35a, at 102-108. According to Parodi, after the dustup, Leone boasted, “I think I finally got a way to get [Robbins’] permits and get him out of business.” App. 125, 126. Leone pressed the local sheriff to charge Robbins for his conduct in the encounter with Pennoyer, but the sheriff declined to do so. CA10 App. 331-332.
Leone cited the Pennoyer incident as one ground, among others, to suspend Robbins’ special recreation use permit. That permit allowed Robbins to lead ranch guests on cattle drives, which were his primary source of revenue from the property. App. 49. BLM aimed at the cattle drives in other ways too. Undermining the authenticity of the expe *572 rience Robbins offered his guests, BLM employees followed along in trucks, videotaping participants. The Government suggests that this surveillance was a legitimate way to document instances when Robbins crossed onto federal land without permission. The suggestion, however, hardly explains why, on one occasion, BLM employees videotaped several female guests who were seeking privacy so they could relieve themselves. CA10 App. 506-507.
As part of the campaign against Robbins, Parodi was instructed to “look closer” for trespass violations, to “investigate harder” and “if [he] could find anything, to find it.” App. 129, 130. Parodi testified, in relation to the instructions he was given, that he did not have problems with Robbins: He never found a trespass violation he regarded as willful, and Robbins promptly addressed every concern Parodi raised. Id., at 124,127.
The Court maintains that the BLM employees “were within their rights to make it plain that Robbins’s willingness to give the easement would determine how complaisant they would be” about his infractions, but the record leaves doubt. Ante, at 558. Parodi testified that he was asked to “do things [he] wasn’t authorized [to do],” App. 124, and that Leone’s projections about what BLM officers would do to Robbins exceeded “the appropriate mission of the BLM,” id., at 128. About Vessels, Parodi said, “[i]t has been my experience that people given authority and not being held in check and not having solid convictions will run amuck and that [is] what I saw happening.” Id., at 125. Eventually, Parodi was moved to warn Robbins that, if he continued to defy BLM officials, “there would be war, a long war and [BLM] would outlast him and outspend him.” Id., at 132. Parodi found BLM’s treatment of Robbins so disturbing that it became “the volcanic point” in his decision to retire. Id., at 133. “It’s one thing to go after somebody that is willfully busting the regulations and going out of their way to get *573 something out of the government,” Parodi said, but he saw Robbins only “as a man standing up for his property rights.” 10 Record, PI. Exh. 35C, at 41.
The story thus far told is merely illustrative of Robbins’ allegations. The record is replete with accounts of trespasses to Robbins’ property, vindictive cancellations of his rights to access federal land, and unjustified or selective enforcement actions. Indeed, BLM was not content with the arrows in its own quiver. Robbins charged that BLM officials sought to enlist other federal agencies in their efforts to harass him. In one troubling incident, a BLM employee, petitioner David Wallace, pressured a Bureau of Indian Affairs (BIA) manager to impound Robbins’ cattle, asserting that he was “a bad character” and that “something need[ed] to be done with [him].” CA10 App. 359. The manager rejected the request, observing that the BIA had no problems with Robbins. Ibid.
Even more disconcerting, there was sufficient evidence, the District Court recognized, to support Robbins’ allegation that BLM employees filed false criminal charges against him, claiming that he forcibly interfered with a federal officer. Federal prosecutors took up the cause, but Robbins was acquitted by a jury in less than 30 minutes.[1] A news account reported that the jurors “were appalled at the actions of the *574 government,” one of them commenting that “Robbins could not have been railroaded any worse ... if he worked for the Union Pacific.” Id., at 852.
BLM’s seven-year campaign of harassment had a devastating impact on Robbins’ business. Robbins testified that in a typical summer, the High Island Ranch would accommodate 120 guests spread across six cattle drives. As a result of BLM’s harassment, in 2008, Robbins was able to organize only one cattle drive with 21 guests. Id., at 507-508. In addition, Robbins reports that he spent “hundreds of thousands of dollars in costs and attorney’s fees” seeking to fend off BLM. Brief for Respondent 9, n. 6.
To put an end to the incessant harassment, Robbins filed this suit, alleging that the Fifth Amendment forbids government action calculated to acquire private property coercively and cost free, and measures taken in retaliation for the owner’s resistance to an uncompensated taking. Even assuming Robbins is correct about the Fifth Amendment, he may not proceed unless he has a right to sue. To ground his claim for relief, Robbins relies on Bivens, 403 U. S. 388.
II
“The very essence of civil liberty certainly consists in the right of every individual to claim the protection of the laws, whenever he receives an injury.” Marbury v. Madison, 1 Cranch 137, 163 (1803). In Bivens, the Court drew upon that venerable principle in holding that a victim of a Fourth Amendment violation by federal officers has a claim for relief in the form of money damages. “Historically,” the Court observed, “damages have been regarded as the ordinary remedy for an invasion of personal interests in liberty.” 403 U. S., at 395.
The Court’s decisions recognize that the reasoning underlying Bivens is not confined to Fourth Amendment claims. In Davis v. Passman, 442 U. S. 228, 248-249 (1979), the Court allowed a suit seeking money damages for employ *575 ment discrimination in violation of the equal protection component of the Fifth Amendment. “[U]nless [constitutional] rights are to become merely precatory,” the Court stated, “litigants who allege that their own constitutional rights have been violated, and who at the same time have no effective means other than the judiciary to enforce these rights, must be able to invoke the existing jurisdiction of the courts for . . . protection.” Id., at 242. Soon after Passman, the Court applied Bivens again, recognizing a federal right of action to gain damages for an Eighth Amendment violation. Carlson v. Green, 446 U. S. 14 (1980).
Carlson announced two exceptions to Bivens’ rule. “The first [applies] when defendants demonstrate special factors counselling hesitation in the absence of affirmative action by Congress.” 446 U. S., at 18 (quoting Bivens, 403 U. S., at 396). “The second [applies] when defendants show that Congress has provided an alternative remedy which it explicitly declared to be a substitute for recovery directly under the Constitution and viewed as equally effective.” Carlson, 446 U. S., at 18-19 (emphasis in original). Prior decisions have invoked these exceptions to bar Bivens suits against federal officers in only three contexts.[2]
In Bush v. Lucas, 462 U. S. 367, 368 (1983), a federal employee sought recovery for First Amendment violations alleged to have occurred in his workplace. As a civil servant, the plaintiff had recourse to “an elaborate, comprehensive scheme” administered by the Civil Service Commission, in which constitutional challenges were “fully cognizable.” Id., at 385, 386. The Court declined to recognize a judicial remedy, lest it interfere with Congress’ carefully calibrated system. For similar reasons, in Schweiker v. Chilicky, 487 *576 U. S. 412, 414, 424-429 (1988), the Court held that the Social Security Act’s scheme of administrative and judicial remedies left no void to be filled by a Bivens action. Likewise, on two occasions, the Court concluded that “the unique disciplinary structure of the Military Establishment” precluded a Bivens action for harm to military personnel through activity incident to service. United States v. Stanley, 483 U. S. 669, 679 (1987) (internal quotation marks omitted); Chappell v. Wallace, 462 U. S. 296, 304 (1983).
Some Members of this Court consider Bivens a dated precedent. See ante, at 568 (Thomas, J., concurring) (“Bivens is a relic of the heady days in which this Court assumed common-law powers to create causes of action.” (quoting Correctional Services Corp. v. Malesko, 534 U. S. 61, 75 (2001) (Scalia, J., concurring))). But the Court has so far adhered to Bivens’ core holding: Absent congressional command or special factors counseling hesitation, “victims of a constitutional violation by a federal agent have a right to recover damages against the official in federal court despite the absence of any statute conferring such a right.” Carlson, 446 U. S., at 18.
Ill
A
The Court does not hold that Robbins’ Bivens suit is precluded by a carefully calibrated administrative regime like those at issue in Bush, Chilicky, Chappell, or Stanley, nor could it. As the Court recognizes, Robbins has no alternative remedy for the relentless torment he alleges. True, Robbins may have had discrete remedies for particular instances of harassment. But, in these circumstances, piecemeal litigation, the Court acknowledges, cannot forestall “death by a thousand cuts.” Ante, at 555 (quoting Brief for Respondent 40). For plaintiffs in Robbins’ shoes, “it is damages or nothing.” Bivens, 403 U. S., at 410 (Harlan, J., concurring in judgment).
*577 Despite the Court’s awareness that Robbins lacks an effective alternative remedy, it nevertheless bars his suit. The Court finds, on the facts of this case, a special factor counseling hesitation quite unlike any we have recognized before. Allowing Robbins to seek damages for years of harassment, the Court says, “would invite an onslaught of Bivens actions,” ante, at 562, with plaintiffs pressing claims “in every sphere of legitimate governmental action affecting property interests,” ante, at 561.
The “floodgates” argument the Court today embraces has been rehearsed and rejected before. In Passman, the Court of Appeals emphasized, as a reason counseling denial of a Bivens remedy, the danger of “deluging federal courts with [Fifth Amendment based employment discrimination] claims.” 442 U. S., at 248 (internal quotation marks omitted). This Court disagreed, turning to Justice Harlan’s concurring opinion in Bivens to explain why.
The only serious policy argument against recognizing a right of action for Bivens, Justice Harlan observed, was the risk of inundating courts with Fourth Amendment claims. He found the argument unsatisfactory:
“[T]he question appears to be how Fourth Amendment interests rank on a scale of social values compared with, for example, the interests of stockholders defrauded by misleading proxies. Judicial resources, I am well aware, are increasingly scarce these days. Nonetheless, when we automatically close the courthouse door solely on this basis, we implicitly express a value judgment on the comparative importance of classes of legally protected interests.” 403 U. S., at 410-411 (citation omitted).
In attributing heavy weight to the floodgates concern pressed in this case, the Court today veers away from Justice Harlan’s sound counsel.
*578 B
In the Court’s view Robbins’ complaint poses an inordinate risk of imposing on vigilant federal officers, and inundating federal courts, for his pleading “fails to fit the [Court’s] prior retaliation cases.” Ante, at 556. “Those cases,” the Court says, “turn[ed] on an allegation of [an] impermissible purpose and motivation.” Ibid. (citing Rankin v. McPherson, 483 U. S. 378 (1987); Lefkowitz v. Turley, 414 U. S. 70 (1973); and United States v. Jackson, 390 U. S. 570 (1968)). Robbins’ suit, the Court maintains, raises a different sort of claim: that BLM employees went “too far” in their efforts to achieve an objective that “[a]ll agree” was “perfectly legitimate”: “trying to induce [Robbins] to grant an easement for public use.” Ante, at 556. Developing a legal test to determine when federal officials have gone “too far,” ante, at 557, the Court asserts, would be an “endlessly knotty” task; the attendant uncertainty, the Court fears, would bring on a “tide of suits,” inducing an undesirable timidity on the part of federal officials, ante, at 562.
The Court’s assertion that the BLM officials acted with a “perfectly legitimate” objective, ante, at 556, is a dubious characterization of the long campaign to “bury” Robbins. See App. 49. One may accept that, at the outset, the BLM agents were motivated simply by a desire to secure an easement. But after Robbins refused to cover for the officials’ blunder, they resolved to drive him out of business.[3] Even *579 if we allowed that the BLM employees had a permissible objective throughout their harassment of Robbins, and also that they pursued their goal through “legitimate tactics,” ante, at 557,[4] **4 it would not follow that Robbins failed to state a retaliation claim amenable to judicial resolution.
. Impermissible retaliation may well involve lawful action in service of legitimate objectives. For example, in Board of Comm’rs, Wabaunsee Cty. v. Umbehr, 518 U. S. 668 (1996), this Court held that a county board of commissioners may cross into unconstitutional territory if it fires a contractor for speaking out against members of the board on matters of public concern. The Court recognized that terminating a contractor for public criticism of board practices might promote legitimate governmental objectives (e. g., maintaining relationships of trust with those from whom services are purchased). Id., at 674. The Court, furthermore, instructed that even where the background law allows a government agency to terminate a contractor at will, the agency lacks carte blanche to do so in retaliation for constitutionally protected conduct. Id., at 677.[5] 6 The same is true here: *580 BLM officials may have had the authority to cancel Robbins’ permits or penalize his trespasses, but they are not at liberty to do so selectively, in retaliation for his exercise of a constitutional right.[6]
I therefore cannot join the Court in concluding that Robbins’ allegations present questions more “knotty” than the mine-run of constitutional retaliation claims. Because “we have established methods for identifying the presence of an illicit reason ... in retaliation cases,” ante, at 556, Robbins’ suit can be resolved in familiar fashion. A court need only ask whether Robbins engaged in constitutionally protected conduct (resisting the surrender of his property sans compensation), and if so, whether that was the reason BLM agents harassed him.[7]
C
The Court’s opinion is driven by the “fear” that a “Bivens cure” for the retaliation Robbins experienced may be “worse *581 than the disease.” Ante, at 561. This concern seems to me exaggerated. Robbins’ suit is predicated upon the agents’ vindictive motive, and the presence of this element in his claim minimizes the risk of making everyday bureaucratic overreaching fare for constitutional litigation. See Olech, 528 U. S., at 566 (Breyer, J., concurring in result) (“In my view, the presence of [vindictive action] in this case is sufficient to minimize any concern about transforming run-of-the-mill zoning cases into cases of constitutional right.”).
Indeed, one could securely forecast that the flood the Court fears would not come to pass. In Passman, the Courts said that it did not “perceive the potential for ... a deluge,” because, under 42 U. S. C. § 1983, “a damages remedy [was] already available to redress injuries such as petitioner’s when they occur under color of state law.” 442 U. S., at 248. A similar side-glance could be cast here. Because we have no reason to believe that state employees are any more or less respectful of Fifth Amendment rights than federal agents, § 1983 provides a controlled experiment. If numerous Bivens claims would eventuate were courts to entertain claims like Robbins’, then courts should already have encountered endeavors to mount Fifth Amendment Takings Clause suits under §1983. But the Court of Appeals, the Solicitor General, and Robbins all agree that there , are no reported cases on charges of retaliation by state officials against the exercise of Takings Clause rights. 433 F. 3d 755, 767 (CA10 2006); Brief for Petitioners 48; Brief for Respondent 31. Harassment of the sort Robbins alleges, it seems, is exceedingly rare. Cf. Olech, 528 U. S., at 565-566 (Breyer, J., concurring in result).[8]
*582 One can assume, arguendo, that, as the Court projects, an unqualified judgment for Robbins could prompt “claims in every sphere of legitimate governmental action affecting property interests.” Ante, at 561. Nevertheless, shutting the door to all plaintiffs, even those roughed up as badly as Robbins, is a measure too extreme. Cf. Hein v. Freedom, From, Religion Foundation, Inc., post, at 640, n. 1 (dissenting opinion) (“To the degree ... claims are meritorious, fear that there will be many of them does not provide a compelling reason ... to keep them from being heard.”). There are better ways to ensure that run-of-the-mill interactions between citizens and their Government do not turn into cases of constitutional right. Cf. Bivens, 403 U. S., at 410 (Harlan, J., concurring in judgment) (“I simply cannot agree ... that the possibility of frivolous claims ... warrants closing the courthouse doors to people in Bivens’ situation. There are other ways, short of that, of coping with frivolous lawsuits.” (internal quotation marks omitted)).
Sexual harassment jurisprudence is a helpful guide. Title VII, the Court has held, does not provide a remedy for every epithet or offensive remark. “For sexual harassment to be actionable, it must be sufficiently severe or pervasive to alter the conditions of the victim’s employment and create an abusive working environment.” Meritor Savings Bank, FSB v. Vinson, 477 U. S. 57, 67 (1986) (internal quotation marks and brackets omitted). See also National Railroad Passenger Corporation v. Morgan, 536 U. S. 101, 115 (2002) (hostile work environments develop “over a series of days or perhaps years and, in direct contrast to discrete acts, a single act of harassment may not be actionable on its own”). Adopting a similar standard for Fifth Amendment retaliation claims would “lesse[n] the risk of raising a tide of suits threatening legitimate initiative on the part of the Government’s employees.” Ante, at 562. Discrete episodes of hard bargaining that might be viewed as oppressive would not entitle a litigant to relief. But where a plaintiff could prove a pattern *583 of severe and pervasive harassment in duration and degree well beyond the ordinary rough-and-tumble one expects in strenuous negotiations, a Bivens suit would provide a remedy. Robbins would have no trouble meeting that standard.[9]
IV
Because I conclude that Robbins has a right to sue under Bivens, I must briefly address the BLM employees’ argument that they are entitled to qualified immunity. In resolving claims of official immunity on summary judgment, we ask two questions. First, “[tjaken in the light most favorable to the party asserting the injury, do the facts alleged show the officer’s conduct violated a constitutional right?” Saucier v. Katz, 533 U. S. 194, 201 (2001). And, if so, was that right clearly established, such that a reasonable officer would have known that his conduct was unlawful? Id., at 201-202.[10]
The Takings Clause instructs that no “private property [shall] be taken for public use, without just compensation.” U. S. Const., Arndt. 5. Robbins argues that this provision confers on him the right to insist upon compensation as a condition of the taking of his property. He is surely correct. Correlative to the right to be compensated for a taking is the right to refuse to submit to a taking where no compensation is in the offing. Cf. Dolan v. City of Tigard, 512 U. S. 374 (1994) (invalidating a permit condition that would have *584 constituted a taking); Nollan v. California Coastal Comm’n, 483 U. S. 825 (1987) (same).
Robbins further argues that the BLM agents’ persistent harassment impermissibly burdened his right to refuse to grant the Government something for nothing. Once again, he is surely correct. To cover for their mistake in failing to record the prior easement, BLM demanded, with no legal authority, that Robbins cede a new easement. Robbins refused, as was his constitutional right. At that point, BLM might have sought to take Robbins’ property by eminent domain (assuming the agency was authorized to do so), or it might have attempted to negotiate with him. Instead, the agents harassed Robbins and tried to drive him out of business.
The Court has held that the Government may not unnecessarily penalize the exercise of constitutional rights. This principle has been applied, most notably, to protect the freedoms guaranteed by the First Amendment. See, e. g., Umbehr, 518 U. S., at 674-675, 686 (freedom of speech); O’Hare Truck Service, Inc. v. City of Northlake, 518 U. S. 712, 716-720 (1996) (freedom of association); Sherbert v. Verner, 374 U. S. 398, 403-406 (1963) (freedom of religion). But it has also been deployed to protect other constitutional guarantees, including the privilege against self-incrimination, Turley, 414 U. S., at 82-84, the right to trial by a jury, Jackson, 390 U. S., at 581-583, and the right to travel, Memorial Hospital v. Maricopa County, 415 U. S. 250, 254-262 (1974). The principle should apply here too. The constitutional guarantee of just compensation would be worthless if federal agents were permitted to harass and punish landowners who refuse to give up property without it. The Fifth Amendment, therefore, must be read to forbid government action calculated to acquire private property coercively and cost free, and measures taken in retaliation for the owner’s resistance to uncompensated taking. Viewing the facts in the *585 light most favorable to Robbins, BLM agents plainly violated his Fifth Amendment right to be free of such coercion.
The closest question in this case is whether the officials are nevertheless entitled to immunity because it is not clearly established that retaliation for the exercise of Fifth Amendment rights runs afoul of the Constitution. The “dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.” Saucier, 533 U. S., at 202. As noted, all concede that there are no reported cases recognizing a Fifth Amendment right to be free from retaliation. However, it is inconceivable that any reasonable official could have believed to be lawful the pernicious harassment Robbins alleges. In the egregious circumstances of this case, the text of the Takings Clause and our retaliation jurisprudence provided the officers fair warning that their behavior impermissibly burdened a constitutional right. See Hope v. Pelzer, 536 U. S. 730, 739-741 (2002).
* * *
Thirty-six years ago, the Court created the Bivens remedy. In doing so, it ensured that federal officials would be subject to the same constraints as state officials in dealing with the fundamental rights of the people who dwell in this land. Today, the Court decides that elaboration of Bivens to cover Robbins’ case should be left to Congress. Ante, at 562. But see supra, at 580, n. 6. The Bivens analog to § 1983, however, is hardly an obscure part of the Court’s jurisprudence. If Congress wishes to codify and further define the Bivens remedy, it may do so at anytime. Unless and until Congress acts, however, the Court should not shy away from the effort to ensure that bedrock constitutional rights do not become “merely precatory.” Passman, 442 U. S., at 242.
*586 For the reasons stated, I would affirm the judgment of the Court of Appeals insofar as it addressed Robbins’ Fifth Amendment retaliation claim.[11]

 Despite the rapid acquittal, the trial court denied Robbins’ request for counsel fees, finding that he failed to prove “the position of the United States was vexatious, frivolous, or in bad faith.” Departments of Commerce, Justice, and State, the Judiciary, and Related Agencies Appropriations Act, 1998, §617, 111 Stat. 2519, note following 18 U. S. C. §3006A. The Court counts this a significant point favoring petitioners. See ante, at 552 (“[T]he federal judge who presided at the trial did not think the Government’s case thin enough to justify awarding attorney’s fees.”). But, as Robbins notes, the trial court passed only on the prosecutor’s litigation position, not on whether the allegations of the BLM employees, which prompted the prosecution, were made in bad faith. Brief for Rer spondent 7, n. 5.

 The Court cites Correctional Services Corp. v. Malesko, 534 U. S. 61 (2001) (suit against private prison), and FDIC v. Meyer, 510 U. S. 471 (1994) (suit against federal agency), among cases in which we have declined to extend Bivens. Ante, at 550. Neither was a suit against a federal officer.

 Robbins agreed, the Court relates, “that the Bureau’s employees intended to convince Robbins to grant an easement.” Ante, at 556. In support, the Court notes that Robbins posed this question: “[C]an government officials avoid the Fifth Amendment’s prohibition against taking property without just compensation by using their regulatory powers to harass, punish, and coerce a private citizen into giving the Government his property without payment?” Ibid., n. 8 (quoting Brief for Respondent 21; alteration in original). Robbins’ descriptive words — “harass, punish, and coerce” — are hardly synonyms for “convince.” Robbins has maintained throughout that the officials’ motives were vindictive, a characterization amply supported by the record. Indeed, the agents’ seven-year campaign of harassment calls to mind W. H. Auden’s famous lines: “Their *579 cause, if they had one, is nothing to them now; They hate for hate’s sake.” There Will Be No Peace, reprinted in W. H. Auden: Collected Poems 615 (E. Mendelson ed. 2007).

 The Court observes that the Interior Board of Land Appeals (IBLA) approved some of BLM’s enforcement actions against Robbins. Ante, at 545, 546, 558. Significantly, however, the IBLA declared that, as it was not a court “of general jurisdiction,” it had “no authority to invalidate [BLM action] based on proof of improper motive on the part of a BLM official or employee involved in the development or issuance of the decision.” Robbins v. Bureau of Land Management, 170 I. B. L. A. 219, 227 (2006). Accordingly, the IBLA refused to entertain Robbins’ contention that BLM enforcement actions were “part of a pattern of activities amounting to willful violations of civil, criminal, or constitutional law.” Ibid.

 Invoking Pickering v. Board of Ed. of Township High School Dist. 205, Will Cty., 391 U. S. 563 (1968), the Court, in Board of Comm’rs, Wabaunsee Cty. v. Umbehr, 518 U. S. 668, 685 (1996), held that the board’s legitimate interests must be balanced against the free speech interests at stake to arrive at the appropriate constitutional judgment.

 In Mt. Healthy City Bd. of Ed. v. Doyle, 429 U. S. 274, 287 (1977), the Court held that a defendant in a First Amendment employment retaliation case can avoid liability by showing that “it would have reached the same decision as to [the plaintiff’s] reemployment ... in the absence of the protected conduct.” This test, the Court explained, is necessary to “distinguis[h] between a result caused by a constitutional violation and one not so caused.” Id., at 286. Mt. Healthy's causation standard, as today’s opinion notes, is applicable here; hence, Robbins’ claim is not governed by a “motive-is-all test.” See ante, at 560, n. 10. Thus, if the BLM officials proved at trial that, even if Robbins had not refused to grant an easement gratis, they nonetheless would have canceled his permits, harassed his guests, and filed false criminal charges against him, they would escape liability for retaliation in violation of the Fifth Amendment (though perhaps exposing themselves to other sanctions).

 The Government, I recognize, should not be hampered in pursuing lawful means to drive a hard bargain. See ante, at 558-560, n. 10. Trespassing, filing false criminal charges, and videotaping women seeking privacy to relieve themselves, however, are not the tools of “hard bargaining.” They have a closer relationship to the armed thug’s demand: ‘Tom- money or your life.” By concentrating on the allegedly lawful actions the BLM agents took (e. g., canceling a right-of-way), ibid., the Court gives a bloodless account of Robbins’ complaint.

 The rarity of such harassment makes it unlikely that Congress will develop an alternative remedy for plaintiffs in Robbins’ shoes, and it strengthens the case for allowing a Bivens suit. As noted above, every time the Court declined to recognize a Bivens action against a federal officer, it did so in deference to a specially crafted administrative regime. See supra, at 575-576.

 My “emphasis on the extent and duration of the harm suffered by Robbins,” the Court asserts, indicates that under my approach, Robbins “could not obtain relief without . . . satisfying an unspecified, and unworkable, ‘too much’ standard.” Ante, at 557-558, n. 9. My approach, however, is no less specific nor more unworkable than the approach courts routinely employ in Title VII harassment cases.

 As I have elsewhere indicated, in appropriate cases, I would allow courts to move directly to the second inquiry. See Brosseau v. Haugen, 543 U. S. 194, 201-202 (2004) (Breyer, J., joined by Scalia and Ginsburg, JJ., concurring). See also County of Sacramento v. Lewis, 523 U. S. 833, 859 (1998) (Stevens, J., concurring in judgment).

 I agree that Robbins failed to state a claim under Racketeer Influenced and Corrupt Organizations Act and therefore join Part III of the Court’s opinion.