RENDERED: MAY 30, 2025; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2024-CA-0747-MR

DENISE BENTLEY							APPELLANT


								APPEAL FROM JEFFERSON CIRCUIT COURT
v.							HONORABLE SUSAN SCHULTZ GIBSON, JUDGE
								ACTION NO. 22-CI-002288


LOUISVILLE METRO
GOVERNMENT AND
DONNA PURVIS							APPELLEES


OPINION
AFFIRMING

** ** ** ** **

BEFORE:  CETRULO, L. JONES, AND McNEILL, JUDGES.

CETRULO, JUDGE:  Appellant Denise Bentley ("LA Bentley") – former legislative assistant for appellee Donna Purvis ("Councilwoman Purvis") – appeals a Jefferson Circuit Court order that granted appellees' motion for summary judgment and dismissed LA Bentley's First Amendment and retaliation claims prior to trial.  Finding no error, we affirm.

## FACTS & BACKGROUND

In November 2018, Councilwoman Purvis, a relative newcomer to politics, was elected to represent Louisville Metro District 5. LA Bentley, a more experienced politician, helped the councilwoman during her campaign and then agreed to stay on as her legislative assistant as the councilwoman adapted to her new role. As the councilwoman's legislative assistant, LA Bentley was an at-will employee of Louisville Metro Government, but was hired by and served at the pleasure of her Louisville Metro Council member. The women had been friends for more than 45 years, but at this time their friendship morphed into an employment relationship.

After an initial post-election acclimation period, LA Bentley left the councilwoman's employment only to return to the legislative assistant role through the 2020 pandemic. It appears from the record that the two women had a tumultuous working relationship as exemplified by two specific events: a November 2021 birthday party, and a January 3, 2022 phone call.

In November 2021, LA Bentley had a large, fundraising birthday party, and invitees included family, friends, politicians, and members of the legal community. During this party, various people were asked to speak, but Councilwoman Purvis was not asked to speak. Yet, after the other speeches ended, the councilwoman asked if she could say a few words and LA Bentley agreed.

During the councilwoman's speech, she told a tale she intended to be humorous but included a reference to LA Bentley as a "redbone."

During LA Bentley's later deposition, she defined "redbone," in full, as "an African American female of light complexion." Later, at trial, she stated the term was derogatory, but Councilwoman Purvis, also an African American, stated she intended (and believed) the term to be complimentary. The parties now agree the term is a form of colorism,[1] a type of racism. LA Bentley said she was offended by the use of the term, but she did not immediately inform the councilwoman that she took offense.

However, on January 3, 2022, LA Bentley called Councilwoman Purvis to voice her discontent about the use of the racial term, among other grievances, and to inform her that she would not be assisting with her reelection campaign. LA Bentley recorded this phone call; the trial court relied upon it for the summary judgment order; and it is part of the record on appeal. This conversation is discussed below in more detail.

On January 4 and 5, Councilwoman Purvis messaged LA Bentley about campaign issues, but she did not reply. On January 6, Councilwoman Purvis informed Louisville Metro Government that LA Bentley was no longer employed

---

[1] Colorism is a "prejudice or discrimination especially within a racial or ethnic group favoring people with lighter skin over those with darker skin." *Colorism*, MERRIAM-WEBSTER.COM DICTIONARY, https://www.merriam-webster.com/dictionary/colorism (May 2, 2025).

as her legislative assistant.  LA Bentley later stated she did not find out about her termination until she noticed her email and city cell phone had been disconnected.

In May 2022, LA Bentley sued Councilwoman Purvis and Louisville Metro Government, asserting:  1) a 42 U.S.C.[2] § 1983 action alleging she had been discharged in violation of her rights under the First Amendment; 2) a common law defamation *per se* claim; and 3) a retaliation claim under the Kentucky Civil Rights Act ("KCRA").  Following discovery, the Jefferson Circuit Court partially granted and partially denied appellees' motion for summary judgment.  The trial court's order dismissed the First Amendment and retaliation claims, but allowed the defamation claim to proceed to trial.  A jury found Councilwoman Purvis defamed LA Bentley but awarded her only $1 in punitive damages.  LA Bentley now appeals only the summary judgment order dismissing her First Amendment and retaliation claims.

**STANDARD OF REVIEW**

The standard of review upon appeal of an order granting summary judgment is "whether the trial court correctly found that there were no genuine issues as to any material fact and that the moving party was entitled to judgment as a matter of law."  *Scifres v. Kraft*, 916 S.W.2d 779, 781 (Ky. App. 1996) (citing Kentucky Rule of Civil Procedure 56.03).  Upon a motion for summary judgment,

---

[2] United States Code Annotated.

all facts and inferences in the record are viewed in a light most favorable to the non-moving party and "all doubts are to be resolved in [her] favor." *Steelvest, Inc. v. Scansteel Serv. Ctr., Inc.*, 807 S.W.2d 476, 480 (Ky. 1991). The trial court "must examine the evidence, not to decide any issue of fact, but to discover if a real issue exists." *Id.* Thus, a summary judgment looks only to questions of law, and we review *de novo*. *Brown v. Griffin*, 505 S.W.3d 777, 781 (Ky. App. 2016).

"The moving party bears the initial burden of showing that no genuine issue of material fact exists, and then the burden shifts to the party opposing summary judgment to present" evidence establishing a triable issue of material fact. *Lewis v. B&R Corp.*, 56 S.W.3d 432, 436 (Ky. App. 2001) (citations omitted). That is, "[t]he party opposing a properly presented summary judgment motion cannot defeat it without presenting at least some affirmative evidence showing the existence of a genuine issue of material fact for trial." *City of Florence, Kentucky v. Chipman*, 38 S.W.3d 387, 390 (Ky. 2001).

## ANALYSIS

On appeal, LA Bentley argues the trial court erred in dismissing her (A) First Amendment and (B) retaliation claims prior to trial. Councilwoman Purvis and Louisville Metro Government argue that LA Bentley did not meet her burden of showing a genuine issue of material fact, that her First Amendment rights were violated, or that her firing was a pretext in retaliation of her voicing a

good faith complaint of discrimination on account of race or color. We agree that LA Bentley did not meet her burden and find no error in the trial court dismissing these two claims prior to trial.[3]

### A. 42 U.S.C. § 1983/First Amendment

"[A] State may not discharge an employee," even an at-will employee, "on a basis that infringes that employee's constitutionally protected interest in freedom of speech." *Rankin v. McPherson*, 483 U.S. 378, 383 (1987) (citations omitted). Further, "the Constitution prohibits a government employer from discharging or demoting an employee because the employee supports" or refuses to support "a particular political candidate." *Heffernan v. City of Paterson, N.J.*, 578 U.S. 266, 270 (2016) (citations omitted).

On appeal, LA Bentley argues council members do not have the right to demand reelection support from a legislative assistant, and while council members may *request* support with campaigns, their staff have the right to decline that request and voice opposing viewpoints. LA Bentley asserts that

---

[3] LA Bentley also argued on appeal that Louisville Metro Government should be held vicariously liable for Councilwoman Purvis's actions. "Vicarious liability, sometimes referred to as the doctrine of respondeat superior, is not predicated upon a tortious act of the employer but upon the imputation to the employer of a tortious act of the employee[.]" *Patterson v. Blair*, 172 S.W.3d 361, 369 (Ky. 2005) (citation omitted). However, "[i]n circumstances under which the liability of the employer is purely derivative, he cannot be held liable while the employee at the same time is found not." *Kiser v. Neumann Co. Contractors, Inc.*, 426 S.W.2d 935, 937 (Ky. 1967). Accordingly, as we find dismissal of the claims against the councilwoman to be without error – and thus, no liability imposed on Councilwoman Purvis – additional discussion of vicarious liability is not appropriate or necessary.

Councilwoman Purvis improperly fired her for choosing not to support her reelection campaign, thereby violating her First Amendment right to free speech.

To the contrary, Councilwoman Purvis argues that it is within her right, as an elected official, to hire and retain staff members who are supportive and contribute to a cooperative work environment. She argues that she did not fire LA Bentley solely because she refused to support her reelection campaign but rather, as demonstrated by the January 3 phone call, because the working relationship had reached its professional end and was no longer effective.

To determine if the discharge of a public employee violates the First Amendment, the court must apply a two-part inquiry. *Scarbrough v. Morgan Cnty. Bd. of Educ.*, 470 F.3d 250, 255 (6th Cir. 2006) (citation omitted). "The threshold question is whether the employee's speech may be fairly characterized as constituting speech on a matter of public concern." *Id.* (citing *Rose v. Stephens*, 291 F.3d 917, 920 (6th Cir. 2002) (internal quotation marks omitted)). "If the speech relates to a matter of public concern, then the court employs the balancing test outlined in *Pickering v. Board of Education*, 391 U.S. 563 . . . (1968), to determine if the employee's free speech interests outweigh the efficiency interests of the government as an employer." *Rose*, 291 F.3d at 920. Applying this test, to prevail on a retaliation claim stemming from the exercise of First Amendment rights,

an employee must prove that the conduct at issue was constitutionally protected, and that it was a substantial or motivating factor in the termination. If the employee discharges that burden, the government can escape liability by showing that it would have taken the same action even in the absence of the protected conduct. . . . And even termination because of protected speech may be justified when legitimate countervailing government interests are sufficiently strong.

*Bd. of Cnty. Comm'rs v. Umbehr*, 518 U.S. 668, 675 (1996).

Even assuming – *for arguendo* – that LA Bentley's comments constituted a matter of public concern, her claim still fails because her "speech" did not come close to meeting the requirements of the *Pickering* balancing test.

During the January 3 call, LA Bentley informed the councilwoman that she did not intend to support her reelection campaign, but she also implied their entire working relationship was at an end. This was implicit in her barrage of criticisms of the councilwoman, but also, LA Bentley overtly stated, "I'm not going to continue to be in this type of toxic relationship." Presumably acknowledging the end of this relationship, Councilwoman Purvis stated:

Whatever you feel like you need to do, I understand. I'm not upset with you. I'm not mad with you. I understand when enough is enough, and I respect that. . . . When I decide to run again or what-have-you, I'll let you know.

At no time did the councilwoman state or imply that she was angry about (or terminating LA Bentley for) her decision not to support her reelection campaign. To the contrary, it was clear from the recording that *LA Bentley*

-8-

intended to cut all professional ties because she believed the councilwoman was ill-suited for the position. In fact, LA Bentley berated and belittled Councilwoman Purvis throughout the majority of the 23-minute phone call. LA Bentley criticized the councilwoman's job performance, leadership ability, and commitment to the community. She repeated and appeared to agree with someone that the councilwoman had "no goddamn balls," questioned the councilwoman's integrity, and implied the councilwoman was unprepared and unorganized. LA Bentley explicitly questioned the councilwoman's abilities and implied she publicly shared her criticisms.

The councilwoman did not return the attack, but instead told LA Bentley that she believed, over the last three years, LA Bentley had done things intentionally to hurt her professionally and/or personally. In response to the scolding, the councilwoman stated:

> I could have smiled wrong, and you would have said something about the way I smiled. I could have stood wrong, and you would have [said] something about the way that I stood. . . . I'm sorry I'm not, you know, the polished professional, classy, person in your life. . . but [LA Bentley], you have hurt me, my feelings, over and over again. . . . I'm not the aggressor between the two [of us], so you just did whatever you wanted to do. . . . It's hard to believe you are as mean to anybody as you are to me.

It is clear from the record that LA Bentley did not view herself as a subordinate of Councilwoman Purvis nor did she engage with the councilwoman in

a respectful or professional manner. As stated by the trial court, it does not appear that LA Bentley was terminated only because she stated she would not support the councilwoman in her reelection. The veracity of LA Bentley's statements is immaterial; the important aspect of the conversation is that it highlighted the incompatibility of the women as working professionals.

While our role is to view the facts in a light most favorable to LA Bentley, her words left no room for doubt. It is difficult to imagine how the functioning of that government office – District 5 – could have been productive or effective after the January 3 phone call.

> When close working relationships are essential to fulfilling public responsibilities, a wide degree of deference to the employer's judgment is appropriate. Furthermore, we do not see the necessity for an employer to allow events to unfold to the extent that the disruption of the office and the destruction of working relationships is manifest before taking action.

C*onnick v. Myers*, 461 U.S. 138, 151-52 (1983) (citations omitted). And, government employers are afforded "sufficient discretion to manage their operations." *Garcetti v. Ceballos*, 547 U.S. 410, 422 (2006).

Overall, LA Bentley's words were more akin to insubordination than they were to honesty or aid. LA Bentley did not prove that her refusal to support the councilwoman's reelection campaign was a factor in her firing, let alone a substantial or motivating factor. *See Umbehr*, 518 U.S. at 675. She did not

-10-

establish that her interest as a citizen outweighed the efficiency interests of the government. *See id.* In fact, the January 3 phone call demonstrated that Councilwoman Purvis had a legitimate countervailing government interest in ending LA Bentley's employment; LA Bentley's firing was the expected, necessary product of the phone conversation; and their working relationship had become ineffectual. We find no error in the dismissal of this claim.

### B. KCRA Retaliation

Kentucky Revised Statute ("KRS") 344.280(1) prohibits an employer from retaliating against a person who makes a good faith complaint of discrimination or hostile work environment on account of race or color. *See also* KRS 344.040(1)(a) (any discrimination based on "race" or "color" is unlawful). The parties agree that Councilwoman Purvis did use the term "redbone" in reference to LA Bentley at her birthday party. The Councilwoman stated that she intended the term to be complimentary, but LA Bentley asserts the term is derogatory and colorist. Regardless, the Director of Louisville Metro Council Services deemed the word "not acceptable."

During the January 3 phone call, LA Bentley told the councilwoman that she was offended by her use of the term and was embarrassed by its use. Councilwoman Purvis apologized for using the term during the January 3 phone call and explained she did not intend it as an insult. LA Bentley asserts that

Councilwoman Purvis fired her in retaliation for complaining about the councilwoman's use of the "racial slur." She argues that racial slurs by a supervisor, even when made outside the office setting, can be unlawful. LA Bentley argues that the trial court should not have dismissed her retaliation claim because a reasonable jury could have found in her favor under these circumstances. She argues (1) the time between the protected activity and the decision to terminate was "almost non-existent" (3 days); (2) Councilwoman Purvis admits the causation of the January 3rd conversation (*i.e.*, that the January 3 phone call contributed to her firing); and (3) the protected activities contained in that conversation were substantial factors in the adverse actions that followed. However, despite the timing and the councilwoman's admission that the January 3 phone call contributed to the termination, we do not agree that a reasonable jury could have contributed her firing to the protected speech.

Under KRS 344.280, "claims of retaliation involve a burden-shifting approach." *Benningfield v. Fields*, 584 S.W.3d 731, 738-39 (Ky. 2019). First, the plaintiff must establish a *prima facie* case of retaliation by showing that "(1) [s]he engaged in a protected activity; (2) the defendant knew that the plaintiff had done so; (3) adverse employment action was taken; and (4) that there was a causal connection between the protected activity and the adverse employment action." *Id.* (citation omitted). Once a *prima facie* case is shown, the burden shifts to the

-12-

employer to provide "a legitimate, non-retaliatory reason for the adverse employment action." *Id.* If "the employer can provide a legitimate explanation, the burden then shifts back to the employee to demonstrate that this reason was merely a pretext for retaliation." *Id.*

For argument's sake, even if we believed LA Bentley established a *prima facie* case of retaliation, Councilwoman Purvis provided numerous legitimate explanations for firing her legislative assistant, and LA Bentley did not meet her burden of demonstrating that her firing was merely a pretext.

In the January 3 phone call, LA Bentley did tell Councilwoman Purvis she found the term "redbone" to be offensive and inappropriate, but that was one complaint within a barrage of many. The conversation – in whole – was an employee explaining to her employer why the employer was ill-suited for her position, why her peers did not respect her, and why continuing to work for her was untenable. Indeed, the conversation in whole suggested LA Bentley was resigning. The conversation was not rooted in racial discrimination, and at no point did LA Bentley complain she was being unfairly treated because of her race, that she was facing hostility in the workplace because of her race, or that she was otherwise subjected to adverse employment actions because of her race or skin tone. At no point did LA Bentley complain (or even imply) that she believed any aspect of her relationship with Councilwoman Purvis was impacted by the

councilwoman's alleged discriminatory views. An employee needs more than mere "vague charge[s] of discrimination" to establish unlawful employment practices. *Booker v. Brown & Williamson Tobacco Co., Inc*., 879 F.2d 1304, 1313 (6th Cir. 1989).

Moreover, pretext may be shown where "the proffered reason: 1) had no basis in fact; 2) did not actually motivate the adverse employment action; or 3) was insufficient to motivate that action." *Thomas v. Mech. Consultants, Inc.*, 655 F. Supp. 2d 756, 766 (W.D. Ky. 2009) (citing *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994)). The question is whether a jury could find from the evidence, viewed in LA Bentley's favor, a "reasonable disbelief" of Councilwoman Purvis's proffered reason, and LA Bentley needed to show that circumstantial evidence demonstrated that retaliation "more likely than not" motivated the councilwoman to terminate LA Bentley's employment. *See Spengler v. Worthington Cylinders*, 615 F.3d 481, 494 (6th Cir. 2010) (citation omitted).

Here, even viewing the evidence in favor of LA Bentley, it is not reasonable to believe LA Bentley was fired for complaining about the councilwoman's use of the term "redbone," nor is it reasonable to believe the councilwoman did not have other legitimate reasons for firing LA Bentley. LA Bentley, herself, enumerated the reasons within the phone call that *she* recorded

-14-

and supplied to the court. LA Bentley did not show that the councilwoman was motivated to retaliate (for her criticism of the councilwoman's use of the racial term), nor did she show that this criticism was a motivating factor in her dismissal. From the January 3 phone call alone, it is abundantly clear that LA Bentley's firing was *not* merely a pretext for retaliation and LA Bentley presented no genuine issue of material fact. Further, a reasonable jury could not have had a reasonable disbelief in the councilwoman's proffered reasons for firing LA Bentley. We find no error in the dismissal of this claim.

## CONCLUSION

Accordingly, we AFFIRM the Jefferson Circuit Court.

ALL CONCUR.

BRIEFS FOR APPELLANT:

Jamie K. Neal
Kevin C. Burke
Louisville, Kentucky

Robyn Smith
Preston J. Spicer
Louisville, Kentucky

Kevin Sciantarelli
Louisville, Kentucky

BRIEF FOR APPELLEES:

Katherine T. Watts
Ryan D. Nafziger
Hayley A. Abbott
Louisville, Kentucky